RAY v. STATE.

*(Nashville.    February  8,  1902.)*

1. MURDER.    *Facts that support verdict for murder in the first degree.*

The facts set out in the Court's opinion are held to support a ver-
dict of murder in the first degree, but this Court overrules the
Circuit Judge's action disregarding the jury's finding of miti-
gating circumstances, and pronounces judgment of imprison-
ment for life, instead of sentence of death.    *(Post, pp. 285-289.)*

2. JURY TRIAL.    *Examination on voir dire.*

It is not error for the Court to permit a proposed juror in a mur-
der case to be asked by the Attorney-general, in an examina-
tion on the *voir dire,* even in the presence of other jurors
already selected, whether he has any conscientious or religious
scruples against capital punishment or against hanging for
murder in the first degree if the proof showed guilt.    *(Post,
pp. 289, 290.)*

3. WITNESS.    *Answering that he has no knowledge of matter inquired
about.*

Where a witness answers that he has no knowledge of the mat-
ter inquired about there can be no cause for reversal, even if
the question was an improper one and proper exception was
taken.    The whole matter becomes immaterial.    *(Post, pp.
290, 291.)*

4. SUPREME COURT.    *Will not reverse for remarks of Attorney-gen-
eral, when.*

There is no reversible error where, on the trial of a murder case,
the Attorney-general remarked, in connection with .defend-
ant's proof of deceased's bad character, addressing the Court
in the presence of the jury, "I presume, sir, we would not be
allowed to show that the defendant himself is no geranium?"
and the Court replied, " No, sir; you cannot.    The law conclu-
sively presumes that the defendant is of good character," and
the Attorney-general assented to this, saying, "Certainly, sir;
that is true; that is the law."    The Attorney-general's remarks

Ray *v.* State.

were improper, but the Court did all that could be done to counteract their prejudicial effect. (*Post, pp. 291, 292.*)

5. SAME. *Same.*

It is not reversible error in a murder case for the Attorney-general, in the argument, to state, after premising that the State cannot inquire into the defendant's character unless he first opens it up, that the jury had, nevertheless, a right to pass upon the character of defendant, who had testified in his own behalf, from the evidence in the record, and that this evidence showed him to be a member of a gang of crap-shooting negroes, there being, in fact, proof in the record that defendant had played craps with some of his witnesses, who were, like himself, negroes. (*Post, pp. 292, 293.*)

6. SAME. *Will not reverse for permitting examination of witness, when.*

It is not reversible error in a capital case for the Court to permit the examination of an additional witness by the State after the defendant and one of his witnesses had testified for the defense, where the witness had testified on a former trial, and the Attorney-general gave notice, when the case was taken up, of the absence of the witness and what he expected to prove by him, and obtained leave to examine him, when he should arrive, during the progress of the trial, it further appearing that the witness could not be had earlier and had not heard any of the evidence already introduced. (*Post, pp. 293, 294.*)

7. CHARGE OF COURT. *Request covered by charge properly refused.*

There is no error in the Court's refusal to give a request for further instructions, where the charge already given is sufficiently comprehensive and substantially embraces the matter of the request. The original charge in this case was sufficient on the subject of overt act, and embraced the matter of the request for further instructions on that subject, and the request was, therefore, properly refused. (*Post, pp. 294, 295.*)

8. INDICTMENT. *For murder sufficiently charges a battery.*

An indictment for murder is good, though it contains no express averment of a battery, which charges that the defendant "with a certain dangerous weapon, to wit: a gun, which he in his hands then and there had and held, in and upon the body of one Gene Prentiss, feloniously, willfully, deliberately, and premeditatedly, and with malice aforethought did make

---

Ray *v.* State.

---

an assault upon the body of said Gene Prentiss, and did then and there unlawfully  *  *  *  by the means and in the manner aforesaid, kill and murder the said Gene Prentiss, against the peace and dignity of the State." A battery is implied from the force of the words "kill" and "murder." (*Post, pp. 295-298.*)

Code construed: § 6439 (S.); § 5349 (M. & V.); § 4598 (T. & S.).

Cases cited: Alexander *v.* State, 3 Heis., 475; Riddle *v.* State, 3 Heis., 401; Williams *v.* State, 401; Williams *v.* State, 3 Heis., 376.

9. NEW TRIAL. *Motion disposed of on extension of term.*

The Court does not lose jurisdiction to dispose of a motion for a new trial and to pronounce sentence on the verdict in a criminal case where the motion is made during the term, and the Court is held open for that purpose until a future day beyond the regular limit of the term, and until the regular term of the Court in another county has intervened. Such action is authorized under Acts 1899, Ch. 40, as heretofore construed by this Court. (*Post, pp. 298-301.*)

Act construed: Acts 1899, Ch. 40.

Case cited: Street R. Co. *v.* Simmons, 107 Tenn., 392.

10. MURDER. *Mitigating circumstances.*

This Court finds sufficient reasons in the evidence in this case to reverse the trial Judge's action in overruling the jury's finding of mitigating circumstances, and pronouncing sentence of death upon the defendant for murder in first degree, and condemns the defendant to life imprisonment in accordance with the recommendation of the jury. (*Post, pp. 301-303.*)

---

FROM GILES.

---

Appeal in error from Circuit Court of Giles County. SAM HOLDING, J.

Ray *v.* State.

Ben Childers, J. T. Crossno and Stewart Wilkes for Ray.

Attorney-general Pickle and Flournoy Rivers for State.

McAlister, J. Plaintiff in error was convicted of murder in the first degree for killing one Genie Prentiss, colored, the jury, however, finding mitigating circumstances.

The facts necessary to be stated are that in the jury and sentenced the prisoner to be executed. He has appealed in error.

The facts necessary to be stated are that in July, 1898, the prisoner and the deceased became involved in a difficulty over a game of craps; each drew a knife and made a demonstration toward the other, at the same time indulging in very abusive language, and violent threats against each other's life. They were separated and nothing further occurred on that occasion. It appears that on the Tuesday following there was a negro burial at Briar Ridge Church, in the Fourteenth Civil District of Giles County. After the congregation was dismissed, and the people were starting home, the defendant appeared upon the scene armed with a double-barreled shotgun. The deceased, who had been in attendance at the burial, was in the act of mounting his horse to start for his home. According to witnesses, he had the bridle rein in his left hand, and his right hand

was on the saddle or horse's mane. There is some testimony to show that he had his left foot in the stirrup, ready to mount, when the defendant approached and said to him: "I want my bridle." Deceased replied: "I reckon not to-day." The defendant replied, "By God, pull it off." The deceased then stepped forward and reached out with his left hand to take the bridle off the horse's head. He had to unbuckle the throat-latch of the bridle, and this he had done, and was slipping the bridle off the horse's head, when the prisoner fired. The first shot took effect in the left side of the stomach.

When the deceased fell, he cried, "Oh, don't shoot me any more, George," but the defendant immediately fired a second shot. Deceased was on his hands and knees, as if attempting to arise, when the prisoner fired the second shot, which grazed his coat just across the middle of his back. After firing the second shot, the prisoner reloaded his gun' and walked away, saying to a witness, "I told him to stay away from my house, and he wouldn't do it." The body of the deceased was removed to the church and dressed. No weapon of any kind was found on his person. In the watch pocket of his trousers was found a small pocket knife unopened. The deceased only lived a short time.

There is evidence in the record tending to show that the prisoner had threatened the de-

ceased and had made preparations to take his life. On the morning of the killing the prisoner borrowed a double-barreled shotgun from a neighbor, stating at the time that he wanted it to kill a hawk. On the way he discharged both barrels, which he reloaded heavily. A witness who saw him reload the gun, remarked: "If you load that way you will soon run out of ammunition," when defendant replied, "I am loading this to count me one."

Another witness introduced by the State testified that a few days after the killing he and the defendant were on the road going toward Campbellsville, when the defendant told witness about the killing. He said: "I went there to kill that negro, and I done it and came away. I asked him for my bridle, and did not give him time to say anything." He also stated that "Genie was so mean that no one would do anything to him for killing him. Nobody liked him, anyhow." Witnesses for the State who were present at the killing agree in their testimony that deceased was making no demonstration toward the defendant at the time he was shot, and showed that the killing was without any provocation on his part. The defendant, on the other hand, testified that at the time of the killing, deceased started at him with a knife, and that he shot him in self-defense. Defendant also testified that deceased had been intimate with his wife. He claimed that

on one occasion, when he was approaching his own house, the deceased came out of the door and ran away. He states that this was on the morning of the difficulty between him and deceased over the game of craps, as he was going home. Other witnesses, including one or two introduced by the defendant himself, testified that they were present on that occasion, and that deceased did not leave defendant's house. Other negroes who were in the house testified that deceased had been there. The defendant is contradicted in this statement by his own witnesses, as well as those introduced by the State, and his statement on this subject is evidently without any foundation whatever in fact.

In the opinion of the Court, the defendant had become enraged at deceased on account of the difficulty over the game of craps on Sunday morning previous. He threatened to take the life of deceased, armed himself with a double-barreled shotgun, and deliberately put this threat into execution, there being at the time no overt act or demonstration on the part of the deceased that would have justified the defendant in believing that he was in danger of death or great bodily harm. It moreover appears from the record that after committing the deed, the defendant fled, and there was difficulty in capturing him.

Without further statement of the facts, we pro-

Ray *v.* State.

ceed to notice the assignments of errors urged for a reversal of the case.

First asignment is that while the jurors were being examined on their *voir dire,* touching their competency and qualifications as jurors, the Attorney General, over the objection of defendant's counsel, was permitted by the court to propound the following questions to several jurors: "Have. you any conscientious or religious scruples against capital punishment? Have you any religious or conscientious scruples against hanging a man for murder in the first degree, when the proof shows him guilty?"

One juror replied that he had such scruples, and when he said, "I don't believe in hanging," the Attorney General asked him, "But if the law inflicts that penalty as punishment for such offense, do you believe in it, or is the law wrong?" The juror answered: "The law is wrong; I don't believe in hanging."

The Attorney General offered to challenge the juror for this cause, which challenge was overruled by the Court, and thereupon the Attorney General challenged the juror peremptorily. It is insisted that this practice on the part of the court was erroneous and highly prejudicial to the rights of the defendant, since three jurors had already been selected and were then in the box, and were necessarily prejudiced by the assump-

24 P—19

tion on the part of the Attorney General that the defendant was guilty.

We think there was no error in this action of the Court. It has frequently occurred in *nisi prius* trials that jurors otherwise competent have been unwilling to execute the law, upon a finding of murder in the first degree, on account of conscientious or religious scruples against capital punishment. Mistrials have frequently resulted on this account, thus entailing unnecessary cost and consumption of the public time. The examination of the juror on his *voir dire* would discover this objection and obviate an expensive and fruitless trial.

The second assignment of error is that the Attorney General asked the witness, John Price, if he was present when the deceased won a bridle from George Ray at a crap game, to which counsel objected on the ground that there was no proof that a bridle had been won at any time, but the Court overruled the objection, whereupon witness answered that he was never at any such game, and knew nothing of such an occurrence. He had heard that deceased won a bridle from George Ray at a crap game, whereupon the Attorney General cautioned the witness that he had not inquired about what he had heard.

The Court permitted the question to be asked on the ground that the ownership of the bridle, about which the killing took place, and how and

why the deceased had it on his horse might be or become a material question in the trial. We think the question was entirely proper, but it is wholly immaterial since the witness had no personal knowledge of the matter, and was not permitted to answer what he had heard in respect of it.

The third assignment of error is based upon an alleged improper remark by the Attorney General in the presence of the jury, which occurred in this way. On his cross examination, W. H. Lucy, State witness, said: "I knew Gene Prentiss, or Gene Yokley; he was called by both names. I knew his general character in that neighborhood where he lived for peace and quietude, and the reverse; it was bad. He had several rows with negroes in the neighborhood." Here the Attorney General remarked to the Court in the presence of the jury: "I presume, sir, we would not be allowed to show that the defendant himself is no geranium," to which remark the Court said, in reply to the Attorney General, "No, sir; you cannot. The law conclusively presumes that the defendant is of good character," to which the Attorney General assented, saying, "Certainly, sir, that is true; that is the law," and here the incident closed. It is insisted that this remark was highly prejudicial to the defendant, since it left on the mind of the jury an impression that the State could prove that defendant was of bad

character, if it had been permitted to do so. We think the Court's action in promptly checking the effort of the Attorney General was all that could have been expected, or in the power of the Court to do, in order to counteract any bad effect of the remark. The remark was improper, but when the Court ruled that the evidence was inadmissible, the Attorney General promptly assented, and nothing further could have been done to correct any prejudice that might have been excited.

The fourth assignment of error is based upon an alleged improper remark made by the Attorney General during his closing argument to the jury, as follows: "Now, the law of the State is that the State cannot inquire into the character of the defendant unless he chooses first to · open the question up." The defendant's counsel promptly objected to this statement, whereupon the Court said: "The rule, as stated by Mr. Rivers, is correct. The law presumes the defendant to be innocent and of good character. The State cannot inquire into his character unless he does so first." Thereupon the Attorney General said:

"This is so, gentlemen of the jury. The law presumes every man to be innocent and of good character. This presumption stands as a witness in his favor until overturned by competent and credible proof. We cannot introduce evidence as to the character of the defendant, but you pass upon it from all the evidence introduced in the

entire case. And the proof in this case—the defendant's own proof—his own statement even, their whole course of conduct shows that all these darkies are of the same stripe, and both deceased and defendant belonged to the same gang of crap-shooting negroes."; But we think the objection is hypercritical. The proof in the record does show that the prisoner had been engaged in a game of craps on the Saturday night and Sunday morning before the killing, with a number of the witnesses, and it was no transgression of the rights of the defendant for the Attorney General, in his closing argument, to refer to that fact, and to state that he was evidently a member of a "crap-shooting gang of negroes."

The fifth assignment of error is that the Court erred in permitting the State to introduce the witness, Ezekiel Campbell, after the defendant and one of his witnesses had been examined. There was no error in this action of the Court. The witness had already testified at a former trial. A subpoena had been issued for him for that trial, but was not served until after the trial had been in progress for a day and a half. Moreover, it appears that when the case was taken up, the Attorney General made a statement of what he expected to prove by the witness, and obtained permission of the Court to examine him as soon as he might arrive during the progress of the trial. It further appears that

the witness was not put under the rule with the other witness, for the reason that he arrived during the night after the Court had adjourned, and was put on the witness stand next morning upon the reopening of the Court.

It does not appear that the witness heard any of the other witnesses examined, or talked or conversed with them, or knew of any fact concerning which they testified.

The sixth assignment is that the Court erred in refusing to submit the following instructions to the jury, namely: "What is, or what is not, an overt act or demonstration of violence varies with the circumstances. Under some circumstances a slight movement may justify instant action, because of reasonable apprehension of danger; under other circumstances this would not be so. And it is for the jury, not the Judge, passing upon the weight and effect of the evidence to determine how this may be." The Court refused these instructions upon the ground that they were already embraced in the charge. On this subject the Court stated in his general charge as follows: "Previous threats, or even acts, of hostility, how violent soever, nor the violent and dangerous character of the deceased, if you should so find, will not, of themselves, excuse the slayer, but there *must be some overt act, that is an open, manifest act on the part of the deceased* at the time, clearly indicative of a present pur-

pose to do injury. To constitute the defense, the belief, or apprehension of danger must be founded on sufficient circumstances to authorize the opinion that the deadly purpose then exists, and the fear that it will at that time be executed. If any animosity existed on the part of the deceased to the defendant, as indicated by words and actions, then and before, it is proper matter for the consideration of the jury on the question of reasonable apprehension. The jury is the judge under all the facts and circumstances, whether or not there was reasonable ground to justify the defendant in believing that he was in danger of death or great bodily harm at the time he fired the fatal shot." We think the charge of the Court on the subject of an overt act is sufficiently comprehensive, and embraces substantially the request submitted by the defendant's counsel.

The seventh assignment of error is that the Court erred in not arresting the judgment, for the reason that the indictment failed to charge that any battery was committed by the defendant on the deceased, and in order to charge murder in the first degree it is necessary to allege that a battery was committed at the time. It is insisted that the indictment is too vague as to the manner in which the deceased was killed, because, under the language used in the indictment, he might have been scared to death, which would not be murder in the first degree; or he may

have been beaten to death. We think the language is broad enough to convey the idea of a battery. The indictment in this case charges that the prisoner, "with a certain dangerous weapon,. to wit: a gun, which he in his hands then and there had and held, in and upon the body of one, Gene Prentiss, feloniously, willfully, deliberately, and premeditatedly, and with malice aforethought, did make an assault upon the body of said Gene Prentiss, and did then and there unlawfully, . . . by the means and in the manner aforesaid, *kill* and *murder* the said Gene Prentiss, against the peace and dignity of the State."

The charge that the defendant did then and there kill and murder him implies a battery, and is sufficient.

It is true that murder must be committed by an act applied to or affecting the person either directly, as by inflicting a wound, or indirectly, as by exposing the person to a deadly agency or influence from which death ensues. *Commonwealth* v. *Webster,* 5 Cush., 295. The working upon the fancy of another, or treating him harshly or unkindly, by which he dies of fear or grief, would not constitute this offense. *Ibid. State* v. *Turner,* Wright, 20.

At common law it was only necessary to charge that A. B., on a certain day and year, feloniously, willfully, and of his malice aforethought,

did kill and murder one C. D. By statute fourteenth and fifteenth, Victoria, Chap. 100, Sec. 4, it was provided that in any indictment for murder, or manslaughter, "it should not be necessary to set forth the manner in which, or the means by which, the death of deceased was caused, but it shall be sufficient in every indictment for murder, to charge that the defendant did feloniously, willfully, and of his malice aforethought, kill and murder the deceased, etc." Under our statute defining murder in the first degree, it is necessary to charge that "the killing was done willfully, maliciously, deliberately, and premeditatedly." Shannon's Code, § 6439. In an indictment for murder in the first degree, it is not necessary to state in so many words that the pistol was loaded with powder and ball, or that the wound was made with the ball. *Peterson* v. *State,* 47 Ga., 524; nor is it necessary to designate the part of the person in which the wound was inflicted. *Alexander* v. *State,* 3 Heis., 475.

Nor is it necessary to charge that the wound was inflicted with a particular weapon. *Ibid.*

In *Alexander* v. *State,* 3 Heis., 475, the following form of indictment was held sufficient, to wit:

"That on the 13th of April, 1870, in the State and county aforesaid, one Young Alexander, colored, and Michael Maloney, in and upon William Stewart, did unlawfully make an assault and then and there, unlawfully, deliberately, premeditatedly,

fcloniously, and of their malice aforethought, did
kill and murder, contrary to the form of the
statute made and provided, and against the peace
and dignity of the State." Said the Court, "the
assault recited is not the gravamen of the charge;
that is only inducement to the real charge, which
is, that of killing and murdering," etc. Again
it has been held that an indictment for murder
is good without the use of the word feloniously
or unlawfully. *Riddle* v. *State,* 3 Heis., 401;
*Williams* v. *State,* 3 Heis., 376.

The eighth assignment of error is that the
Court erred in passing judgment and sentence
upon the prisoner, for the reason that the Court
had lost all jurisdiction of the cause by the
intervention of the succeeding term of the Circuit
Court of Williamson County. A more specific
statement of this assignment of error is that the
verdict of the jury was returned on November
30, 1900; a motion for a new trial was made
and entered of record on December 1, 1900, and
by the Court continued until Saturday, December
29, 1900. The minutes of the Circuit Court of
Giles County had been kept open and there had
been no adjournment of that Court, but the Cir-
cuit Court for the county of Williamson was
opened according to law on the first Monday in
December, and was continued until the 29th of
December, 1900, when the Circuit Judge returned
to his Court in Giles County, overruled the mo-

tion of the prisoner for a new trial, and passed
sentence of death. The insistence on behalf of
defendant's counsel is that this judgment was not
rendered either at a regular or special term of
the Court, and that, by the intervention of the
Circuit Court of Williamson County, the Court
lost all jurisdiction of cases that were undeter-
mined by the Circuit Court of Giles County. A
very elaborate and able argument has been sub-
mitted in support of this contention by the
learned counsel of the prisoner, fortified by nu-
merous authorities cited from other States and
jurisdictions.

The question presented, however, is not an open
one in this State, but was recently determined by
this Court in a written opinion in the case of the
*Railroad* v. *Simmons*. In that case it appeared that
while a motion for a new trial was pending, and was
under consideration by the Court in the Madison
County Circuit Court, the Circuit Court of Chester
County began its fall term. The Courts in both
counties were held by the same Judge. After the
beginning of the term in Chester County, the Judge
returned to Madison County, resumed the bench,
and overruled the motion for a new trial. The
exact question presented here arose in that case,
which was whether the Circuit Court had any
jurisdiction over the motion for a new trial pend-
ing in the Circuit Court of Madison County

after the beginning of the Circuit Court of Chester County.

It was held that under the Act of 1899, Chap. 40, that a motion for a new trial partially considered and not determined at the beginning of a new term, was within the intendment of the Act. That Act provides as follows: "That whenever in the Courts of this State any case is pending, and on trial by Court or jury, undetermined at the time the term at which it is pending expires on account of time and on account of the arrival of the succeeding term, the term shall be extended and continued into such succeeding term for all the purposes of trying, disposing of, returning verdict and rendering judgment in such cases so pending, the same as if such new term had not arrived."

We held that the motion for a new trial is within the purpose of this statute, and that so long as the motion for the new trial is being considered by the Court, the case is not disposed of within the meaning of the Act. If this construction is not correct, then the statute involves the absurdity of permitting an infringement upon the succeeding term to the extent of finishing the pending trial, but shutting off the motion for a new trial and the right to appeal. This, of course, the Legislature cannot do, and if the term is extended for the purpose of finishing the trial, it must be further extended for disposing

of a motion for a new trial and the prayer for appeal. All this, we think, is comprehended within the language "disposing of the case and rendering judgment" employed in the statute.

This authority we think conclusive of the assignment of error now urged, that the Court did not have jurisdiction of the case below, after the beginning of a new term in Williamson County.

The case of *Sneed* v. *State* is not controlling here, for the reason that there was no motion for a new trial pending, or any record entry of any matter which was being considered by the Court touching a pending case.

The ninth assignment of error is that the Court erred in sentencing the prisoner to be executed, since the jury found him guilty of murder in the first degree, with mitigating circumstances. It has been repeatedly held by this Court that the recommendation of the jury to mercy is a matter committed to the sound discretion of the Court. The Court, in its charge, instructed the jury that if they found mitigating circumstances, they had the power to commute the sentence from death to imprisonment for life in the State penitentiary.

It is urged, however, that two juries have found mitigating circumstances in favor of the prisoner, and this fact, coupled with certain testimony in the record, commends the prisoner to a commutation of this sentence. It was held in the case

of *Poe* v. *State,* 10 Lea, that the finding of the jury, in their verdict, of mitigating circumstances, although not binding on the Court, is entitled to grave consideration, and ought to prevail in commuting the prisoner's sentence from death to imprisonment for life in the case of circumstantial evidence, if supplemented by the oath of the majority of the jury that they would not have agreed to the verdict if they had not been led to believe that the finding of mitigating circumstances would compel the Court to commute. This Court accordingly in that case commuted the sentence of the prisoner to imprisonment for life. While this is not a case of circumstantial evidence, the fact that two juries found mitigating circumstances is a grave consideration in determining whether or not the death sentence in this case should be affirmed. While we think the evidence clearly makes out a case of murder in the first degree, there is testimony in the record, by two witnesses introduced by the defendant, to the effect that about two weeks before the killing, the deceased stated to these witnesses "that he was keeping the wife of defendant, and would tell defendant so to his face, and if defendant didn't like it, he would kill him." One of these witnesses testified that he did not communicate this threat to the defendant, but the other witness swears that she did tell the defendant about it a short time after hearing it. The prisoner himself

testified that he had been told this by several witnesses. He also testified that he told deceased to stop coming round his house, and to let his wife alone. Another witness introduced by the State testified that immediately after the murder was committed, he saw defendant with his gun on his shoulder, and asked him, as he went off, why he killed the deceased. The defendant said: "Killed him because I told him to stay away from my house, and he wouldn't do it." It is possible that the jury, in finding mitigating circumstances, gave credence to the testimony of the two witnesses to the effect that deceased had boasted to them that he was keeping defendant's wife, and if he made any disturbance about it, deceased would kill him; and while this testimony is, in our opinion, very unsatisfactory, yet we feel constrained, in view of the action of both juries in finding mitigating circumstances, to commute the punishment of the prisoner to imprisonment for life in the State penitentiary, and the judgment of the Court below will be so modified.