HARRY KIRKENDOLL AND CHARLIE SULLINS *v.* STATE
OF TENNESSEE.

(*Nashville,* December Term, 1954.)

Opinion filed May 6, 1955.

498

500

D. M. Harrison, Jr., of Lebanon, for plaintiff in error Sullins.

Z. Alexander Looby and Avon N. Williams, Jr., both of Nashville, for plaintiff in error Kirkendoll.

Knox Bigham, Assistant Attorney General, for the State.

Mr. Justice Burnett delivered the opinion of the Court.

This is an appeal from a conviction of murder in the first degree wherein the punishment was fixed at death by electrocution.

First, lest we might overlook it in the end, we feel that we are called upon to say that able counsel for both plaintiffs in error have done a masterly piece of work in representing these parties. Their briefs herein are excellent

and the arguments made before this court were good. We feel called upon to make this rather unusual statement due to the fact that, as we read this record, counsel really had nothing to go upon in defending these parties except to try in every human way—far beyond the call of duty—to try to minimize the sentence that the plaintiffs in error would receive.

The operator of a filling station on one of the main streets of Lebanon who was working in the nighttime was shot and killed on March 3, 1953. When he was found there was a gun shot wound through his shirt and heart. It was not known then and there was apparently no lead that could be taken up immediately who committed this ghastly murder. Some days after the murder was committed one of the merchants of the County reported to the police that the plaintiff in error Sullins had paid a small account in his store with a $100 bill. This aroused the suspicion of the merchant because people in Sullins' walk of life did not have $100 bills.

The plaintiff in error Sullins is a white man and a rather ignorant tenant farmer and a constable in his district. Kirkendoll is a colored man living on a farm near Lebanon belonging to the mother of two members of the State Bar, to wit: Alfred and Lon McFarland. The merchant who had received this $100 bill being suspicious communicated the fact to the officers. The officers immediately made some check on Sullins and in the early part of May, some two months after the murder, they went to the farm where Sullins lived and attempted to bring him into the town of Lebanon for questioning. It seems from the testimony of these officers that Sullins was nervous, he cursed the officers and demanded the production of a warrant. These officers went back to town and then Sullins returned with them to the Lebanon

City Hall where he was questioned at length by the Mayor, and other officials. To begin with and for some time he denied knowing anything about the crime and denied that he had ever had a $100 bill in his life when he was finally advised by the officers that he had presented such a bill to the merchant. Sullins denied this and the merchant was sent for. While they were waiting for the merchant, Sullins asked the Mayor if it would be any easier on him (Sullins) if he told about it, and was advised by the Mayor that no promises would be made. Sullins thereupon stated that he had to tell it anyway because he had not been able to sleep at night and that his hair was turning gray. He gave a written statement telling how the crime was committed.

According to this confession, he and Kirkendoll had planned in the morning of the day the crime was committed to rob the filling station attendant. Somewhere around 7:30 or 8:00 that night Sullins drove his truck to the McFarland farm and picked up Kirkendoll and the two of them went into the town of Lebanon and got some beer. After observing the filling station for quite a time, Sullins parked his car around the corner in the next block to the filling station and Kirkendoll got out with the rifle, stating that Collier (the filling station attendant) might have a gun and he, Kirkendoll, might need one. Sullins says that when Kirkendoll returned to the car he told him that he had shot Collier and had taken a gun, money pouch and pocketbook. The two then drove back out to the farm within a short distance of where Kirkendoll lived and Sullins divided the money, each of them getting somewhere around $200 and in this money they each had a $100 bill. Sullins' $100 bill had been given to the merchant. Sullins stated that the robbery was planned and that it was decided at that time that they

would hit the filling station attendant in the head and not shoot him and he also stated that he thought Kirkendoll was going to hit him in the head and not shoot him. He says that the rifle that Kirkendoll used belonged to his, Sullins' nephew.

Of course the obvious thing for the officers to do after procuring this confession from Sullins was to go to the McFarland farm and take Kirkendoll into custody. At the time they took him into custody Mr. Lon McFarland was at home and told him to go on with the officers in town that they would not hurt him and he would see that they treated him nice, etc. Kirkendoll after he was taken into town was questioned rather extensively on the way to town and when he got there about his part in the crime and he continuously denied knowing anything about it. Sullins' statement was read to him and he still denied it. Sullins was present in town when Kirkendoll was talked to and Sullins cursed him, accused him of lying, tried to get him to tell about the matter but he consistently refused to do so. In Kirkendoll's presence, Sullins made an additional statement or confession to the effect that a day or two before the killing an unsuccessful attempt had been made by Kirkendoll to rob the filling station attendant. He also stated that when he took Kirkendoll home, that is, after the crime was committed, that he, Sullins, broke the stock of the rifle. Kirkendoll did make a statement that evening in which he admitted having been with Sullins one night in Lebanon but said nothing about the robbery and killing. Both men were subjected to lie detector tests, by their consent. They were placed in jail in Lebanon until the following morning between 4:30 and 5:00 o'clock, when for their protection, they were moved from the jail in Wilson County to Murfreesboro.

They were taken to the Murfreesboro jail on May 14, by two Wilson County officers. One of these officers drove the automobile and Sullins was on the front seat with him while Kirkendoll was on the rear seat with the other officer. Both plaintiffs in error while they were thus riding from Lebanon to Murfreesboro were told by these officers that they thought, that is the officers thought, that it was best to take them away from Lebanon on account of the feeling of the people there about the crime. Apparently the officers and the plaintiffs in error talked about the case from the time that they left Lebanon until they arrived in Murfreesboro. It seems that Sullins all the time was trying to get Kirkendoll to tell the truth about the matter. When they had gone about 10 or 12 miles from Lebanon Kirkendoll asked the officers if they knew he was lying the night before. These officers told him that they did and Kirkendoll then stated that he wanted to tell the truth about the whole thing and that what Sullins had said the night before was right. The officers told him to wait until they got to Murfreesboro where his confession could be written down. When they arrived at the jail they were met by the sheriff of Rutherford County and this officer then took Kirkendoll's confession which was given in Sullins presence.

Kirkendoll's confession is indeed a very lucid statement of one of the most cold-blooded crimes that has ever been our duty to read about. After describing the crime, commission thereof at some detail, Kirkendoll says:

"He (he, filling station attendant) went into his station door. He turned around in his front door, facing me, just like he was looking right at me. I took aim with my rifle on one knee. I aimed at his heart. Just as I pulled the trigger, he jumped straight up and tried to holler. He couldn't holler,

just made a sound. I knew that I had hit him then. He fell right backward, stretched out in the floor. He never kicked. I knew for sure that I had him then. I came from behind the sign and station to see if things were clear, stood and watched for about 10 seconds. Seeing everything clear, I ran up and grabbed his billfold out of his left hip pocket. I then run back behind the sign, peeps out again to see if things were clear. Everything was clear. I run back to Mr. Collier, grabs his money pouch on his belt. I then take off to the car where Mr. Sullins was waiting for me.''

Prior to this portion of the quoted statement Kirkendoll stated that he got out of the car about 300 feet from the filling station and crawled and crept in the shadows up to within about 150 feet of the station and then he committed the act above quoted. After telling these things the statement further is that Kirkendoll threw the part of the rifle which was left after Sullins had broken it, and the purses which he had taken off of the filling station attendant, into a well at the back of his house, that is, Kirkendoll's house and that he had hidden the money in a tin cup in a little red barn behind the McFarland house. As before said Sullins was present and heard Kirkendoll's statement and said that it was true.

Following this statement the officers went to the McFarland place and found the can containing the $100 bill and fished out of the well the filling station attendant's billfold and money pouch and a part of the rifle where Kirkendoll said he had put them. Two days later, while they were still at the Murfreesboro jail the plaintiffs in error both repeated their confessions of this crime, in considerably more detail than their written statements, and this narra-

tion was recorded on a tape recorder. This recording was played back to the jury.

There is no evidence or testimony offered in denial of the guilt of the plaintiffs in error. The testimony offered in their behalf is in the nature of telling of their mental ability, their reputations in the community, the fact that Sullins was elected a constable in his district by write-in vote and that neither of the plaintiffs in error had been in previous trouble. In other words there is no defense to the crime.

Separate briefs and assignments of error have been filed for each plaintiff in error. Naturally and obviously many of the assignments of error and questions raised are the same. Many pages of each brief are almost identical as far as argument and authority, etc., is concerned. We will try, as best we can, to discuss the questions that are common questions raised by each plaintiff in error before taking up those independent questions not assigned by one or the other.

In taking up these questions we will not take them up seriatim but will try to answer each question as it occurs to us. The sixth assignment of each plaintiff in error presents the able argument and insistence (so ably argued by Sullins' counsel in open court) that the lower court erred in refusing to permit these plaintiffs in error to exercise a peremptory challenge as to the juror, Charles Rutledge. As a matter of interest this record is something over 900 pages but about half of it is taken up by examination of the various jurors on their voir dire. This juror, Rutledge, had been accepted by all parties and had taken his seat in the box when counsel for Sullins endeavored to show that he was biased. A brother of Sullins testified that one Odis Midget had called him by telephone and said that he ought to get

Rutledge off the jury. He stated that Midget told him that Rutledge had got gas where he, Midget, worked and that he had been talking to James Collier, a brother of the dead man. Midget, an ex-convict, took the stand and testified that he had worked at a filling station in Lebanon for Jimmy Collier but denied that he had called Robert Sullins about this matter that morning. Jimmy Collier testified that he had known Rutledge for three or four years and that the latter traded at his station sometimes as much as three or four times a week but he, Collier, insisted that the case had never been mentioned between them. The juror Rutledge was called to the stand and questioned and stated that he was in the station with his son almost every day but that he hardly ever got out of his truck. He says he frequently saw James Collier but had no recollection that either of them had ever mentioned the case and did not think the association would influence him. He stated that he liked James Collier as a man. The foregoing is a brief summary of the testimony heard by the trial judge with regard to Rutledge's qualifications as a juror, after he had already been accepted. It seems to us that this boils down to the fact that in the first place Robert Sullins had presented hearsay testimony, ostensibly beginning with an ex-convict, that there might be some vague reason for taking Rutledge off the jury. The ex-convict emphatically denied that he had ever made such a statement and Collier and Rutledge denied that they had ever discussed the case. Thus it seems to us that the trial judge properly found the juror Rutledge was not a biased or prejudiced juror. We have very recently held that a peremptory challenge of a juror may be made at any time before the jury is sworn. *Estep* v. *State,* 193 Tenn. 222, 245 S. W. (2d) 623, 625. It is equally well settled, though, that the erroneous denial of a peremp-

tory challenge is not ground for reversal if the jury is composed of unbiased and unprejudiced jurors. *Long v. State,* 187 Tenn. 139, 213 S. W. (2d) 37. See *Mahon v. State,* 127 Tenn. 535, 156 S. W. 458, 461, where this question was discussed at length and the very excellent and able reason is given of why such is not error.

"The right of peremptory challenge, which means the right to stand aside a proposed juror without any assigned cause other than the mere objection of the accused, is a right that can be regulated by statute. As was well said in Wooten v. State, supra, 'The right to challenge is a right to reject, not to select a jury. If from those who remain an impartial jury is obtained, the constitutional right of the accused is maintained.' "

The Court then goes on and shows very logically and fairly, we think, that under our Harmless Error Statute, Code Section 10654, that when an unbiased and fair juror is selected that even though the right of peremptory challenge has been denied this constitutes harmless error. There is no other claim or showing in the record at all that this juror was anything but fair. The fact is we think that he was a fair and impartial juror under the record as we see it. We say too from our study of the examination of these jurors on their voir dire, that the remaining jurors were, as finally accepted, all fair and impartial.

By Kirkendoll's seventh and Sullins' third assignments, the insistence is made that a juror Will Litchford had prejudged the case as evidenced by statements that he had made prior to the trial. This assignment was likewise very ably argued by able counsel for the plaintiffs in error on the hearing. The evidence offered in support of this ground on motion for new trial was an

affidavit of one man and the testimony of two others. Two of the parties are men by the name of Martin, one of whom had the affidavit and the other testified and it was in substance that the juror Litchford had discussed the case with them and had made the statement to them that if he had anything to do with the trial that he would hang both s. o. b.'s. One of these Martins further stated that sometime prior to the trial and Litchford being accepted on the jury that he had heard Litchford say that anything that the killers of the filling station attendant got would be too good for them. The other witness on this question testified that before the plaintiffs in error were arrested he heard Litchford say that if he Litchford had anything to do with it he would kill anybody who had done a crime like that. All of this testimony was categorically denied by the juror Litchford and his testimony will be found beginning at page 877 of the record. He specifically denied that the statement attributed to him by Corder and the statements the Martins had accused him of making. He seemed to think that it was possible that while he was with the Martins something might have been said about the case but he thought not. In his testimony it came out that he had previously worked for the Martins and that they had had a dispute. It thus might appear that the Martins probably had some interest in embarrassing Litchford.

The qualifications of another juror, to wit: S. M. Reeves, are likewise assailed by Kirkendoll's ninth and Sullins' fourth assignment of error. In support of these assignments on the motion for new trial, one Ricketts testified that prior to the trial he had discussed the matter with Reeves, and that both men agreed that Kirkendoll and Sullins were guilty and should be killed. Reeves testified in opposition to this testimony of Ricketts

and states that he did not recall this conversation with Ricketts and had no recollection of telling anyone that these plaintiffs in error ought to be killed. In regard to these assignments, it is evident that the testimony of Ricketts with regard to his conversation with Reeves is vague and unsatisfactory. At one point he stated that they agreed that the plaintiffs in error should receive a life sentence and again he averred that the agreement was that they should be killed. The testimony with regard to the qualifications of Litchford and Reeves is referred to rather fully by us here because it presents an issue that the trial judge had to weigh the evidence of these various witnesses pro and con. It in the first instance was up to him to determine which evidence was the most credible and it seems to us that under such circumstances his findings should not be disturbed by us. This Court has long ago spoken on this subject where in the case of *Thomas* v. *State,* 109 Tenn. 684, 75 S. W. 1025, the Court said:

"Jurors are elected, impaneled and sworn, and the trial conducted under their immediate direction; and upon all motions for new trials they have the witnesses in relation to the new matter relied upon before them—the better practice being to examine them in open court—and can observe their manner of testifying, see the truth, and determine the matter correctly than this court can from the manner in which the case is presented to it in a bill of exceptions. [Of course here the court is talking about the trial judge.] Therefore every presumption is made in favor of the regularity of the proceedings of trials in those courts, including the qualifications of jurors elected by the parties and impaneled by the judges in such matters. This makes it necessary and highly

proper that the findings of trial judges upon all questions of fact that arise upon motions for new trials should *be given the same force and effect as in cases tried by them on the merits or the findings of juries,* and is always done.'' (Emphasis ours.)

By Sullins' fifth assignment and Kirkendoll's eighth it is contended that a new trial should be granted because of the misconduct of the jury in considering the punishment in another case. The plaintiffs in error argue and attempt to show that one of the jurors mentioned and argued to the jury for the supreme penalty and in doing so compared the case that he was on with the Greenlease case and that by doing so he was able to induce half of the jurors, who were in favor of the lesser penalty, to agree to the supreme penalty. Of course all of us remember the Greenlease case as every paper in the United States carried it to some extent from the time of the commission of this kidnapping until after the conviction of the guilty parties. It seems to us that the evidence on this question offered on the motion for new trial, even though it does show that the Greenlease case was mentioned, that it was not the inducement that persuaded the jury to return the death penalty, but, to the contrary, the jurors made up their minds from the evidence presented and the mention of the Greenlease case was casual. Naturally and normally the parties on the jury, having different ideas about what should be done, are going to argue with the other members of the jury trying to carry their point. This is the only human result to be expected in this life of human beings. These plaintiffs in error complain rather bitterly about this and cite and rely upon the well known rule that no juror is allowed to mention to his fellow jurors any facts within his own knowledge with regard

to a case on trial that have not been introduced in evidence. *Ryan* v. *State,* 97 Tenn. 206, 36 S. W. 930. Such a rule has its obvious merits and we recognize it as a salutary rule but we do not think that the rule has any application here. The Greenlease case and any discussion of it had nothing to do with the facts of the instant case—the facts are entirely different. It seems to us that the situation here is more analogous to that in the case of *Northington* v. *State,* 82 Tenn. 424, wherein this Court, long ago, held that it was not reversible error for the District Attorney General, in his argument to the jury, to refer to another case as a historical fact. This same principle was reaffirmed by this Court in *King* v. *State,* 91 Tenn. 617, at page 642, 20 S. W. 169, at page 175, wherein Judge Lurton delivering the opinion of the Court said:

"The objections principally urged against parts of it apply rather to the reference made by the state officer to the facts of certain other causes tried in that court, and resulting in conviction affirmed by this court. Mere allusions to other causes, as illustrations of argument, has been held by this court, in one of its best-considered cases, to be insufficient ground for a new trial. Northington v. State, 14 Lea 424."

If the District Attorney General (normally we think that his argument should be more persuasive with the jury than the arguments of another juror) is allowed to refer to convictions as historical facts of other cases by way of illustration or persuasion, it seems to us that this same reasoning would apply when the juror to his fellow jurors uses such reasoning. It is our well considered opinion that this does not constitute reversible error.

Sullins' seventh and Kirkendoll's thirteenth assignments make the contention that the jury was so

indoctrinated with the idea of capital punishment after listening for days and being questioned on their voir dire examination. It seems to us that no error was committed in this. From our reading of such an examination it is the examination that we as members of this Court have conducted and seen conducted in criminal trials from the beginning of our practice. We can see nothing unfair or harmful or erroneous by the examination here conducted. This Court long ago in *Ray* v. *State,* 108 Tenn. 282, 67 S. W. 553, 555, so held. There have been numerous other cases since following the Ray case. The Court in the Ray case said:

"We think there was no error in this action of the court. It has frequently occurred in nisi prius trials that jurors otherwise competent have been unwilling to execute the law, upon a finding of murder in the first degree, on account of conscientious or religious scruples against capital punishment. Mistrials have frequently resulted·on this account, thus entailing unnecessary cost and consumption of the public time. The examination of the juror on his voir dire would discover this objection, and obviate an expensive and fruitless trial."

In Kirkendoll's first assignment of error he argues very forcibly that he was prejudiced by introduction in evidence of Sullins' confession that was made in his absence. We discussed in the outset of this opinion this confession of Sullins and it was the one that was made by Sullins before Kirkendoll was brought into Lebanon. It seems to us though that there is no merit in this assignment because at the time Kirkendoll objected to the introduction of this statement of Sullins the trial judge very clearly and forcibly instructed the jury that it could not be considered against Kirkendoll

but only against Sullins. Apparently, from reading the record, Kirkendoll was then satisfied because he made no objection or exception to the statement being read to the jury after these precautionary statements of the trial judge to them. It seems too that he cannot now make the question because he went to trial without making an application for a severance. Then when we read the confession that Kirkendoll made at a later time in the presence of Sullins and read the statements of the two men made in the presence of each other which was heard over the loud speaker it is seen that the two statements are almost identical and it is impossible to see how either could be hurt from the statements that the other made. And then too when they each heard the statement of the other if they had any question about its correctness, humanly the thing that they would have done, was to question it at that time. Since both plaintiffs in error confessed to the crime in detail in the way that we have discussed it seems to us that there cannot possibly be any harm in presenting Sullins' statement made out of Kirkendoll's presence.

In Kirkendoll's second assignment he insists that the confession was made through fear and coercion and therefore should not have been admitted in evidence. This insistence is made solely on the fact that Kirkendoll and his co-defendant were removed on the morning after their arrest from the Lebanon jail after being told by the officers that they thought they would be safer if they were moved to another jail. Kirkendoll makes no insistence that he was subjected to any threats, fear or promises by any of the officers while he was in the City Hall at Lebanon or the jail in Lebanon or Murfreesboro or he was subjected to any improper influence at any time. It is argued in the brief for Kirkendoll and it seems to

us as far as we can determine that such argument is without support in the record because Kirkendoll did not testify as to the admissibility of his confession and there was no evidence presented which supports his contention that the statements with regard to his removal caused him to have any fear. It seems to us that a fair and impartial reading of the record shows clearly the opposite. We have never in our years of practice and on the bench seen one accused of a crime of this nature treated as fairly as these prisoners were treated. Kirkendoll denied for a long time after being arrested that he had anything to do with this crime and even after they left the jail that morning for Murfreesboro he denied it until he was some 10 or 12 miles out of Lebanon when he asked the officers if they thought he was lying. He was being told by these officers when he was being removed to Rutherford County that they were doing everything that they could for his protection. His testimony in the recording which was introduced before the jury is to the effect that the officers treated him fine, he never had white fellows to treat him better. Then too we remember the fact that when he was arrested the Honorable Lon McFarland told him that he would see that he was taken care of and treated fairly. It seems to us that he was. This offer of the officers to take him from one jail to the other was not offered in consideration for him making a confession but was done, it seems to us, out of a high sense of duty. The record indicates clearly that the confession was not the result of fear, but was given after Kirkendoll concluded that the jig was up. His co-defendant had already confessed and he had taken a lie detector test which was unfavorable. It is also shown by the record by other evidence that the confession was not coerced by the officers and the fact

that when he offered to give a statement as they were riding from one jail to the other through the country that they told him to wait until they got to Murfreesboro so it could be written down.

Kirkendoll's eleventh assignment insists that it was error to permit the playing of this tape recording which was made two days after his original confession, the first morning he got to the Murfreesboro jail on May 14. The basis for this contention is that the fear shown to exist previously had not been removed. It seems to us, and we have concluded, that there was no fear and we have tried to point this out in the opinion in reference to the original confession and we are unable to find any fear in either the tape recording or the original confession. It is argued that the sole purpose for the introduction for this statement, that is, the tape recording, was to show that there was no mistreatment by the Lebanon police and that he made no contention that there was such a mistreatment. We can find no reasonable basis for the exclusion of this testimony. The mere fact that both of these plaintiffs in error reaffirmed a previous confession is a corroborative statement on their behalf of previous confessions and by giving to the jury this accurate reproduction of their own voices, the State was rightly presenting to the jury the best available evidence of the matter.

Kirkendoll's third assignment complains that the court erred in overruling his motion for a continuance and for committal to the hospital for the insane for an examination. This motion was oral. The motion was not supported by affidavits or proof of any kind or character. It has long been settled that such applications must be made by plea, verified by the oath of a friend of the defendant, and filed before the trial upon the indict-

ment. The issue made by this plea is then submitted to a specially impaneled jury to try it. *Jordan* v. *State,* 124 Tenn. 81, 135 S. W. 327, 34 L. R. A., N. S., 1115. Another procedure is authorized by Code Supplement Section 4459.1(5) which requires the filing of a petition by the District Attorney General or the Attorney for the defendant, and a hearing. Neither one of these procedures was followed in the present case but to the contrary he sought to present this contention by way of an unsupported oral motion. What we have just said in reference to this obviously are technical considerations which must be considered by us along with the merits. The wife of the plaintiff in error Kirkendoll testified in his behalf at page 775 of the record and told that he had never been in trouble or anything of the kind but she made absolutely no mention of any defective mental condition. When we read Kirkendoll's statements as voluntarily given in this record it seems clear to us that he was not mentally incompetent within the law in this State, where he did not know right from wrong. He tells of how he could shoot a rabbit running with a 22 rifle; he tells of what a good shot he is, he shows it by the way he shot the deceased herein. Other things in the record clearly convince us (inference to be drawn from proven facts in this record that he worked there and lived there on the McFarland farm and what was said to him and done) if there had been any doubt of Kirkendoll's sanity, it would have been raised in the first inception. Then too the trial judge who saw and heard this could have raised such a question as could we if there was any evidence of the facts. It thus seems to us that since Kirkendoll had every opportunity to present this question and has not done so or if he had been mentally incompetent to advise his attorney about things, clearly this could have been

shown. It was not, we think there could be no merit to this assignment.

Kirkendoll's fourth, fourteenth, fifteenth and sixteenth assignments complain of the action of the trial court in denying challenges for cause and requiring him to exercise peremptory challenges as to certain jurors. We think that all the jurors who were finally accepted were unbiased and impartial and that there are no grounds for reversal under these assignments. See *Mahon* v. *State,* supra, and *Long* v. *State,* supra.

The trial judge, so it seems to us, was indeed very patient and painstaking with the State and the plaintiffs in error in the selection of this jury.

"From the fact that he (the juror) was selected, he must be presumed competent. To overthrow this, a clear case must be made out against it." *Mann* v. *State,* 40 Tenn. 373, 377.

In his fifth assignment, Kirkendoll argues that the lower court committed reversible error in denying his motion to quash the panel and for a severance because of the fact that two Negro jurors, who had been accepted by the State and Kirkendoll, were challenged peremptorily by Sullins. Kirkendoll did make a motion to quash the panel, but he did not make a motion for a severance. (Transcript, pages 19, 590.) Sullins made a motion for severance and Kirkendoll did not join in this motion nor did he except to the action of the trial court in overruling it. (Transcript, pages 12, 73.) It seems to us that this assignment is without merit, first for the technical reason that the motion to quash the panel was oral. In *Mahon* v. *State,* supra, it was held that such a motion must be in writing. It seems too that such a motion should be overruled on the merits. When we look at the facts and examination of these jurors on their voir dire we find that there were 18 Negroes who were

examined for jury service. Some of these eighteen the record expressly states were members of the colored race and as to others we draw this conclusion which to us is inescapable from the nature of the questions asked them on their voir dire examinations. Hill, Groomes, Corder, Robinson, DeBow, Richmond and White were challenged for cause by the State. Clark was peremptorily challenged by the State. Seay, Bender, Jennett, Bailey, Bell, Ford and Vantrease were excused by the court. Patton and Hurd were accepted by the State and Kirkendoll and were then challenged peremptorily by Sullins. McLain was accepted by the State and was challenged peremptorily by Kirkendoll. Under the holding, which is conceded to be correct by Kirkendoll, a Negro defendant has no constitutional right to a mixed racial jury. *Kennedy* v. *State*, 186 Tenn. 310, 210 S. W. (2d) 132; *Hall* v. *United States*, 83 U.S. App. D. C. 166, 168 F. (2d) 161, 4 A. L. R. (2d) 1193. From this A. L. R. annotation it is seen that this principle is given universal application. It seems to us that if the State, without denying the Negro defendant his constitutional rights, may exclude all Negroes from the jury by the use of peremptory challenges, then a Negro defendant has less reason to complain when the peremptory challenges were exercised by his co-defendant and not by the State. In such challenges the State has no control. Peremptory challenges may be exercised for any reason or for no reason and Sullins had a right to use his. *Hill* v. *State*, 10 Tenn. 246; *Blackburn* v. *Hays*, 44 Tenn. 227; *Wiggins* v. *State*, 69 Tenn. 738. Kirkendoll excused one Negro juror by the use of the peremptory challenge. We cannot find a scintilla of evidence or inference in this record that he was discriminated against in this particular. He had a right to reasonably anticipate that Sullins would attempt to exclude Negroes from the jury when

they were being tried together and it seems to us that he knowing this fact, if such was a fact, and it is merely being used by us by way of argument that he could have tested his rights by a motion for a severance, supported by proper affidavits, etc., in the outset. This he failed to do. We therefore can hardly see where there is any prejudice and the jury who tried them both gave them both the same sentence.

By his tenth assignment, Kirkendoll complains of the introduction of a photograph of himself which was made in Murfreesboro after he had been taken to jail there on May 14. This photograph is not in the record. The argument of course on this question is that this photograph had no probative value. The State argues to the contrary, though, that the picture made on the same day as the recording was admissible to show the physical condition of the plaintiff in error. He likewise complains in his argument under this assignment that the District Attorney General used this photograph in his agrument before the jury. It seems that the question on the argument of the District Attorney General cannot be assigned because it was not questioned by Kirkendoll but by Sullins. Then for another reason, we think that that would be a legitimate argument for counsel to make in a trial of the case.

In his seventeenth assignment of error Kirkendoll complains of what he refers to as inflammatory remarks by the District Attorney General in his reference to the Mosaic law during the examination of prospective jurors on their voir dire. It seems to us that this statement by the District Attorney General brought about by the fact that counsel for Kirkendoll was in effect arguing with one of the jurors about their religious beliefs in relation to capital punishment. The District Attorney

General's statement was objected to by counsel for Sullins but counsel for Kirkendoll did not object. The court told the jury to disregard the objectionable remarks and admonished the District Attorney General. It seems to us that such a reference to the Mosaic law would not constitute reversible error and remarks of the kind frequently creep into a trial in the heat thereof between counsel, but unless they clearly would have some effect upon the verdict they do not constitute reversible error and this is especially true when the trial judge remonstrated with the District Attorney General and told him not to use a reference of that kind again. The fact is, all counsel on both sides conducted themselves unusually well in a case of such importance.

Sullins argues by his first assignment of error that he has been prejudiced because the trial court did not grant him a severance. His motion for a severance was not supported by affidavits but was based upon the statement which is unsupported that the defenses of these parties would be antagonistic. This same kind of an argument is likewise made almost verbatim by Kirkendoll. The record clearly shows and of course this is hindsight while such motion was made at first but now we have the whole record which shows that the defenses of these two, then defendants, now plaintiffs in error, were not antagonistic because neither one of them has offered any defense to the crime with which he was charged. As we have said before on one occasion herein both of them confessed the guilt of the crime and there is no material discrepancy in these confessions. This court in *Woodruff* v. *State*, 164 Tenn. 530, 538, 51 S. W. (2d) 843, 845, said:

"Prejudice to the rights of the plaintiffs in error from the fact that they were jointly tried and con-

victed could only have resulted if a bona fide defense had been interposed for them. Since no evidence tending to repute the charge of guilt was offered by any of them, none of them was embarrassed in his defense by the fact that the others were being jointly tried. It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants. No such prejudice appears when the crime charged is the result of a clearly proven conspiracy against which no defense is offered in evidence.''

*Stallard* v. *State*, 187 Tenn. 418, 215 S. W. (2d) 807, is likewise authority for this proposition. The Stallard case is cited and relied upon by the plaintiff in error Kirkendoll as authority for his position that he has been prejudiced herein by the reading of the first Sullins confession (one made out of his presence). If the facts by the instant case were anything akin to the facts of the Stallard case wherein the reading of such a confession of one co-defendant was held reversible error, we would unquestionably reverse this case.

■ Both plaintiffs in error make the usual contention that the evidence preponderates against the verdict. As we have said time and time again both defendants gave duplicate and corroborative detailed confessions of committing one of the most cold-blooded

crimes that we have had before us. Their confessions too are corroborated by the testimony of the merchant to the effect that the plaintiff in error Sullins passed this $100 bill and then the fact that the money was found in the little red barn back of Kirkendoll's house and that the dead man's purse and gun were found in the well where Kirkendoll said he put them. This testimony offered on behalf of the State is here without contradiction. Under such a state of facts we think that there can be no question as to the guilt of these parties. We have painstakingly examined this record, read it and the authorities cited by counsel in their able briefs but have been and are unable to find any error herein. The result is that the judgment below must be affirmed and their execution set for August 1, 1955.

 In the fourth assignment of the plaintiff in error Kirkendoll it is very interestingly and seriously argued that error was committed by the trial court accepting the juryman B. Oliver because it is shown that said venireman was unable to read. The argument is that this was error because said juryman or venireman could not read the written charge of the court which was given to the jury after the conclusion of the charge so as to have his own personal knowledge of the contents of the written charge as required by law in felony cases. We have read a number of cases on the question and have given it some independent investigation. It is conceded that the authorities hold that the inability to read or write is not a disqualification to act as a juror, 50 C. J. S., Juries, Sec. 139, p. 866, but the argument is that this juror might qualify under our statute being a householder or freeholder but that since the statutes do require that a written charge be given to the jury and that it is error not to do so, *Adcock* v. *State,* 191 Tenn. 687, 236 S. W.

(2d) 88, that then it must be considered by us to be error to accept a juror who cannot read because such written charge is required to be given to them. We think though that other jurors if necessary could read this to that juror who could not read while in the jury room. The purpose of having the written charge before them, as in effect said in the Adcock case, supra, was to prevent and keep the jury from having to keep running backward and forward into court getting the court to recharge them on various and sundry little things that they might have forgotten. It seems to us that as long as this written charge is in the jury room that there are others there who can read that this would satisfy that question. Consequently this assignment must be overruled.