IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JULY 1998 SESSION



FILED

February 25, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9707-CR-00255 |
| | ) | |
| | ) | Campbell County |
| v. | ) | |
| | ) | Honorable Lee Asbury, Judge |
| | ) | |
| CURTIS CECIL WAYNE BOLTON, | ) | (First degree murder) |
| | ) | |
| Appellant. | ) | |


For the Appellant:

Charles Herman
P.O. Box 337
Jacksboro, TN 37757
(AT TRIAL)

Martha J. Yoakum
District Public Defender
P.O. Box 386
Tazewell, TN 37879
    and
Laura Rule Hendricks
606 W. Main Street, Suite 350
P.O. Box 84
Knoxville, TN 37902-0084
(ON APPEAL)

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
    and
Michael J. Fahey, II
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

William Paul Phillips
District Attorney General
P.O. Box 10
Huntsville, TN 37756


OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Curtis Cecil Wayne Bolton, appeals as of right from his conviction by a jury in the Campbell County Criminal Court of first degree murder for which he received a sentence of life imprisonment in the custody of the Department of Correction. He presents the following issues for our review:

> (1) whether the evidence is sufficient to support his conviction;
>
> (2) whether a juror's failure to reveal a relationship with an assistant district attorney general deprived him of a fair trial;
>
> (3) whether impeachment of the defendant by a codefendant regarding the defendant's prior bad acts denied him of a fair trial;
>
> (4) whether the trial court erred by allowing the introduction of a diagram and the reference to a color photograph of the victim; and
>
> (5) whether the state's biblical reference in closing argument prejudiced the verdict and denied the defendant of a fair trial.

We conclude that no reversible error occurred.

At trial, Detective Eddie Barton of the Campbell County Sheriff's Department testified that he assisted in investigating the death of the victim, Cody Bolton, the defendant's two and one-half-year-old son. He said he went to the defendant's trailer at about 3:00 a.m. on November 23, 1995, after the victim was admitted to the hospital. He said Lisa Boyer, the defendant's live-in girlfriend and the codefendant in this case, was at the trailer, and she told him that the victim had fallen out of his highchair. An autopsy photograph of the victim was admitted into evidence and reflected multiple injuries and bruises on the victim's face, chest and arms.

On cross-examination, Detective Barton said that Ms. Boyer was very calm and unemotional when he spoke with her. He said that she relayed the following

2

facts regarding that night: The defendant went to the emergency room because he injured his finger at work earlier that day. The victim was put to bed and cried when the defendant left the home, and she got him up to feed him at about 11:30 p.m. She put the victim in his highchair and went to wash his tray in the bathroom, then she heard a loud bang. She found the victim lying in the floor with a bruise near his left temple, and he was not breathing. She became hysterical and slapped the victim three times on the face to get him to breathe. The last time she slapped him hard, and he started to breathe. She called her mother, then she called the emergency room to talk to the defendant. She told the defendant to come home because the victim had fallen out of his highchair, and the defendant came home and took the victim to the emergency room. She stayed home with her and the defendant's four-week-old daughter, Alisha. The victim had been sick, and she had asked the defendant to call the clinic to get the victim an appointment, but the clinic was closed. The victim had no injuries when the defendant left to go to the emergency room for his finger.

Campbell County Sheriff Ron McClellan testified that both the defendant and Ms. Boyer gave statements at the sheriff's office. He said he noticed a bandage on the defendant's finger, and he asked the defendant how he injured his finger. He said the defendant told him that he injured it at work. He said the defendant told him that when he walked the victim to his bedroom later that night, the victim would not listen, and he aggravated his injury by swatting the victim on the bottom.

Sharon Sutton testified that she lived in the trailer across from the defendant and Ms. Boyer. She said that on November 22, 1995, she went to bed at about 8:30 or 9:00 p.m. She said that after she went to bed, she heard thumps. She stated that she got up and looked out of her front room window because she thought someone was on one of her vehicles. She said she discovered that the thumps were

3

coming from the defendant's trailer. She said she saw a man and a woman running back and forth in the hall in the defendant's trailer.

On cross-examination, Ms. Sutton said she had been in bed about thirty minutes when she heard the thumps. She said she gave a statement to the police in which she said she did not see or hear any children that night. She said she heard more than one thump, possibly three, and she heard the thumps between 9:00 and 9:30 p.m.

Dr. Cleland Blake, the assistant chief medical examiner for Tennessee, testified that he performed an autopsy on the victim on November 23, 1995. He said the victim had many bruises of differing ages on his body. He said the victim had fresh bruises covering the left side of his face, a bruise under the high right part of his scalp, and a broken right collarbone. He said the victim had deep bleeding under his scalp at the top of his head and in the right side of his brain under the skull. He said that this type of bleeding is caused by an impact to the left side of the head which forces the brain across the skull and causes it to bounce against the other side of the skull, tearing blood vessels and causing the bleeding. He said the victim had swelling and compression of the brain that pushed the brain stem down to the hole in the base of the skull and cut off the victim's blood supply, ultimately causing his death.

Dr. Blake testified that the victim's fatal injury was on the left side of the victim's face on his jaw, left cheek, temple, and behind his left ear. He said the injury was caused by the blunt impact of a surface that pressed the left ear against the head. He said that when the victim arrived at the emergency room at 11:00 p.m., the victim was unconscious. He said the injury would have occurred two to three hours earlier, not immediately before he was brought to the hospital. He said the victim had fresh injuries on the left side of his face, the back of his head, the back of his right shoulder, and his buttocks. He said that the bruise on top of the victim's head was consistent

4

with the victim falling out of a highchair, but it did not cause his death. He said it is inconceivable that the victim's internal bleeding or brain injuries resulted from falling out of a highchair, and to receive such injuries from a fall, the victim would have had to fall more than twenty feet. He said the victim's injuries were consistent with child abuse, and the victim's fatal injury had to be from a very forceful blunt impact between an object and the victim's head. He said that after the victim received the injury, he would have gradually lost consciousness, which could have caused him to fall out of the highchair. He said the injuries on the victim's back and right shoulder and his broken collarbone show that there were definitely two impacts.

On cross-examination, Dr. Blake testified that the victim had some bruising where life support equipment was attached, but he said the bruising was different from the victim's injuries. He said that attempts to resuscitate the victim by slapping him hard on the face would not have caused the victim's injuries or his death. He said the victim's bruises that were one to two days old did not contribute to his death.

Keith McKamey testified that he is a paramedic and that he saw the defendant bring the victim into the emergency room on the night of the incident. He said the defendant was walking at a normal pace toward the hospital. He said he stopped the defendant and asked him what happened, and the defendant said the victim had fallen out of his highchair. He said he told the defendant to take the victim inside. He said he went back to his ambulance to prepare it for the next call and when he finished, he went into the emergency room. He said the defendant was standing inside the door holding the victim. He said he asked the defendant if anybody had helped him yet, and he could tell the victim was in bad condition. He said he checked the victim's pulse, and it was in the fifties or sixties. He said he took the victim back to

5

the triage room. He said he was surprised that the defendant had not yet taken the victim back, and the defendant was not yelling or asking anyone for help.

On cross-examination, Mr. McKamey testified that there was one person working at the emergency room window, and she was talking to someone when he entered the room. He said the defendant carried the victim back to the examining room, and he showed the defendant where to go.

Christy McCulley testified that she was the registration clerk at the emergency room that night. She said she had gone to school with the defendant. She said the defendant first registered at 10:57 p.m. with an injured hand. She said that while the defendant was waiting to be treated, a female called to speak with the defendant. She said the woman, who was crying, told her it was an emergency and asked her to hurry. She said she rang the call to the pay telephone in the waiting area, and the defendant was told to answer it. She said she saw the defendant thirty to forty minutes later with the victim, who looked asleep. She said she was registering another patient, and the defendant stood in the corner. She said the defendant never told her the victim's condition, he was not emotional, and he did not yell for help. She said that Mr. McKamey finally drew her attention to the victim.

Vivian Loudy testified that she was working as a nurse in the emergency room that night. She said she saw the doctors' assistants carry the victim into the examination room. She said the victim was very pale, limp and cold, and he appeared to be near death. She said the victim's pulse was very slow, and his breathing was erratic. She said the police were called.

Dr. Peter V. Claussen testified that he was on duty at the University of Tennessee Hospital in Knoxville that night. He said the victim was flown to UT Hospital

from Campbell County by LifeStar. He said the victim's symptoms were consistent with a blunt, closed-head trauma, and the victim had massive bleeding inside the brain. He said the victim had other injuries consistent with child abuse. He said the victim's injuries could not have been caused by a fall from a highchair. He said the fall would have had to be from about twenty feet. He said the victim's injuries were consistent with him having been thrown into a wall with substantial force, and the fatal injuries occurred one to two hours before the victim was brought to the emergency room. He said the victim may have lost consciousness from the blow, regained consciousness, then deteriorated again. He said it would take the victim one to two hours after the injury to become cold, to have a weak pulse, and to be near death.

On cross-examination, Dr. Claussen testified that it would be possible for a strong, young adult male to throw the victim into a wall covered with paneling. He said that such a force would cause the injuries the victim received.

Lisa Boyer, the codefendant, testified that she began living with the defendant a few weeks before the incident. She said she was seventeen, and the defendant was twenty-two. She said she and the defendant had a four-week-old baby, Alisha, at the time of the incident, and her delivery required a third degree episiotomy. She said she still had stitches from the episiotomy at the time of the incident. She said the victim was not her child, but he lived with her and the defendant, and she cared for him during the day when the defendant was at work. She testified that the defendant was not a good father. She said he did not have a steady job, he did not buy groceries for the family, and he did not pay for anything other than the rent. She said she had A.F.D.C. and W.I.C. benefits and food stamps.

Ms. Boyer testified that the weekend before the incident, the victim stayed with the defendant's mother. She said that when the victim returned, he was sick. She

said he was weak and had a fever and loss of appetite. She said she gave the victim Tylenol and Triaminic. She said three doctor's appointments had been scheduled for the victim, but the defendant canceled all of them. She said she could not take the victim to the doctor because she had no transportation and because the defendant would not allow it. She said that on November 22, 1995, she was baking pies for Thanksgiving the next day. She said the defendant came home from work at about 6:30 p.m. and said he had injured his finger at work. She said the defendant told her that he needed to get a car part, and she told him to pick up some Karo syrup while he was gone. She said that when the defendant left, she finished feeding Alisha and went to give the victim a bath. She said she took off the victim's shirt and saw a massive amount of bruises on his chest. She said this scared her, and she decided not to bathe him.

Ms. Boyer testified that the defendant returned about one and one-half hours later, but he had forgotten the Karo syrup. She said the defendant complained about his finger, and she told him to call his sister. She said the defendant took the victim into the bathroom, changed the victim's clothes, and talked to his sister with the door closed. She said he then left to get the syrup and came back about ten minutes later. She stated that she made dinner for the defendant and the victim, and the defendant sat on the couch and ate. She said she tried to feed the victim, but he did not want to eat. She said she poured grape juice for the victim and told him that if he ate, he would get to drink the juice. She said the victim took a bite of food and chewed then drank some juice. She said she turned around, leaving the juice cup on the victim's tray, and the victim tried to drink the whole cup of juice. She said this caused the victim to choke, and he spit up his food on the highchair tray.

Ms. Boyer testified that she asked the defendant to help her because she was trying to take care of Alisha. She said the defendant got the victim down from the

8

highchair and said he was tired of the victim gagging.  She said the defendant turned the victim over his knee and spanked him.  She said the defendant would not stop spanking the victim, and she finally told him to leave the victim alone and to take him to his bedroom.  She said the defendant continued to spank the victim as they walked through the hall to the victim's room, and the defendant hit the victim so hard he started to fall forward.  She said the defendant grabbed the victim by his shirt collar and carried him into the bedroom.  She said she put Alisha down and took the victim's tray to the bathroom to wash it.  She said she passed the victim's room and saw the victim standing up while the defendant was pointing at him and talking to him.  She said that she took the tray to the bathroom and started to spray it off when she heard a loud thump from the victim's bedroom.  She said she ran to the bedroom and saw the defendant holding the victim by his ankle and wrist, and the defendant threw the victim against the wall above the victim's bed.  She said the victim bounced off the wall and landed face forward, limp on his bed.  She said the defendant then reached up and spanked the defendant's bottom very hard.  She said she screamed and told the defendant that he had done enough and to get out of the room.  She said the defendant came out and said "I warped him so hard, I can't believe he is not crying, I warped him so hard I hurt my hand."

Ms. Boyer said she told the defendant to go to the hospital.  She said that before he left, the defendant told her to try to feed the victim.  She said the defendant told her if the victim would not eat, she should leave him and go to bed, and he would deal with him when he got home.  She said she went to the kitchen and made the victim a new plate of food.  She said she went to get the victim out of bed, but he was not responsive.  She said she helped the victim out of bed, and she noticed that he was walking funny with his legs crossed, and he was slouched and scooting.  She said the victim reached the highchair, and she told him to hop up.  She said the victim did not respond but made a moaning noise.  She said she tried to pick up the victim while she

9

was holding Alisha, but this caused her to stumble forward toward the highchair, and the victim bumped his head on the wall. She said she straightened the victim, gave him some food, and asked him to eat. She said the victim stared straight ahead, and his eyes looked dilated. She said the victim started to slide back in his chair and tried to slide down. She said she put Alisha down and went to the bathroom to get the victim's tray, and she heard a loud thump. She said she ran to the kitchen and saw that the victim had fallen out of his highchair and was lying on the floor.

Ms. Boyer said she ran to the victim and rolled him over, but he was not breathing and had no pulse. She said she became panicked and scared, and she yelled the victim's name. She said she picked up the victim, ran to the bathroom, and splashed cold water on his head, but the victim did not respond. She said she slapped him lightly twice and hard once, and the victim began to breathe. She said she tried CPR on the victim but got no response. She said she noticed extremely large bruises on the side of the victim's face, and the victim was still not breathing normally. She said she called her mother who told her to call an ambulance. She said she did not call an ambulance because she had not lived in the trailer long, and she did not know the address or box number. She said she called her mother again and was hysterical, and her mother told her to call the defendant. She said she called the defendant at the hospital and told him that the victim had fallen out of his highchair and was not breathing. She said she asked the defendant if she should call an ambulance, and the defendant told her she should not, and he would be home in a few minutes. She said the defendant arrived and asked if the victim was breathing, and she said she told the defendant, "barely." She said the defendant dumped a glass of water on the victim, then picked him up and took him to the hospital.

Ms. Boyer testified that Detective Barton took her statement early the next morning. She said she told him about the victim falling out of the highchair, but she did

10

not tell him what the defendant had done because she was afraid of the defendant. She said she later told Detective Scott Smith what the defendant had done, and she waited so long because she was afraid of the defendant and because she felt guilty about letting the victim fall out of the highchair.

On cross-examination, Ms. Boyer said that she first gave a statement to Detective Barton at the trailer on November 23 at 3:00 a.m. She said the defendant was not at the trailer when she gave the statement. She said she gave a recorded statement to Detective Smith and Sheriff McClellan at the sheriff's department on November 23 at 4:55 p.m. She said the officers talked to her for about an hour and one-half before her statement was recorded, and Detective Smith told her to cut through the "bulls**t" because he had a preliminary autopsy report indicating that the fall from the highchair and her efforts to resuscitate the victim killed him. She said Smith told her that a request for a lawyer would be considered a lack of cooperation, and if she did not say what he wanted to hear, he would try to send her to the electric chair. She admitted that she was advised of her rights and was willing to talk without an attorney. She admitted that in the second statement, she said that she picked up the victim and tossed him into his highchair and that his head flew back and hit the wall, but she testified that the statement was not in her own words. She said that after she gave the second statement, she was placed in a cell and charged with murder. She said that five or six hours later, she gave a third statement to Detective Smith, and she finally told him what the defendant had done.

Ms. Boyer testified that the defendant had previously threatened her and told her that he knew everybody in town and that they would believe him not her. She said he told her that her baby would be taken away and that he could cry at the drop of a hat. She said the defendant liked to aggravate the victim. She said he thought it was funny to push the victim down. She said he would also straddle the victim on the floor

11

and hold him down until the victim screamed or cried. She testified that the defendant would pick up the victim by his head and shake him. She said that once during toilet training when the victim wet the floor, the defendant told her she should rub the victim's nose in it like a dog. She said the defendant took the victim into the bathroom and put the wet underpants on the victim's head as the victim cried. She said she did not take out an order of protection against the defendant because she was scared.

On cross-examination by her attorney, Ms. Boyer stated that she is five feet, one inch, and she weighs ninety-five pounds. She said she initially believed that the victim's fall from the highchair caused his death. She said she felt intimidated by Detective Smith, and she had seen him talking with the defendant's family earlier. She said that the district attorney did not promise her anything for her testimony and that she was only testifying to tell the truth. She said she did not cause the victim's injuries and did not physically punish the victim.

Clyde Taylor, the defendant's brother-in-law, testified that the defendant worked for him at his business, T&T Vinyl Siding, on November 22, 1995. He said the defendant injured his right hand at work that day. He said the defendant finished working but complained about his hand. He said the defendant left his car at Taylor's house that morning, and the defendant rode with him to his house after work to pick up his car. He said that later that night, the defendant called Taylor's wife and told her that the victim was ill, and he said his wife went to the hospital. He said he called Lisa Boyer at the trailer, and Ms. Boyer told him that she had been feeding the victim in his highchair when she left to wash his tray. He said Ms. Boyer told him that she heard a thump and found the victim lying unconscious on the floor. Mr. Taylor testified that he went to the trailer the day after the victim died to get things for Alisha, who was staying with him and his wife, and the trailer was clean and orderly. He said the victim's bed was made. He said the defendant had not been back to the trailer since the incident.

12

Mr. Taylor said the defendant was a good employee, and he never saw the defendant mistreat the victim.

On cross-examination, Mr. Taylor testified that the defendant had worked for him full-time for eight months preceding the victim's death. He said the defendant was making as much as three hundred dollars each week. He said he did not know that the defendant had applied for food stamps and A.F.D.C. benefits on October 23, 1995. He identified an A.F.D.C. application in which the defendant reported that he earned four hundred and fifty dollars the preceding month. Mr. Taylor said the defendant no longer works for him, but he denied that the defendant was fired because of drug use. He said his wife maintains the payroll records for his business, and the records do not contain the hourly wages paid to employees.

Lisa Taylor, the defendant's sister, testified that she operates her husband's business office. She said she sometimes prepares the payroll. She said she never saw the defendant mistreat the victim, and they had a normal father/son relationship. She said she drove the defendant and their parents to UT Hospital the morning of the incident, and the defendant was crying and appeared to be devastated. She said that two interns at UT told them that the victim had head injuries. She said the interns told them the injuries were not consistent with the victim falling out of a highchair, and the defendant looked shocked. She said the defendant saw the victim at UT before he died, and the defendant was crying and looked like he might faint. She said that earlier that day when the defendant and her husband returned from work, the defendant's finger was taped. She said the defendant called her later that night at 8:58 p.m. She said that she went with her husband to the defendant's trailer after the victim died, and the trailer was immaculate.

13

On cross-examination, Ms. Taylor testified that the defendant worked for her husband periodically. She said he worked mostly full-time during the year preceding the victim's death. She said the defendant made about seven dollars an hour, and he worked long hours in the weeks preceding the victim's death. She said she was unaware that a month before the victim's death, the defendant had applied for A.F.D.C. benefits and food stamps. She acknowledged that on the application, the defendant reported earning four hundred and fifty dollars per month, and she said that was a lie. Ms. Taylor said that their mother, Ruth Bolton, was the victim's primary caretaker, but she said both Mr. and Mrs. Bolton were sick around Thanksgiving of 1995. She said she and her other siblings felt it was too much for their parents to try to care for the victim, and they felt the defendant should take care of his own child.

Ella Nolan testified that she was in the emergency room with her daughter on November 22, 1995. She said the pay telephone rang, and she answered it. She said a female who seemed calm asked for the defendant, and the defendant took the call. On cross-examination, she said she did not know if it was the receptionist who rang the pay telephone.

Ella Suzanne Nolan, the granddaughter of Ella Nolan, testified that she was at the emergency room that night, and her grandmother asked her to find Curtis Bolton. She said she found him, and the defendant answered the telephone. She said the defendant left and returned about twenty or thirty minutes later carrying the victim. She said the defendant took the victim to the front desk, then went back into the examination room. She said the defendant then came out and paced up and down the hall.

Brian Lloyd, the defendant's cousin, testified that the defendant, the defendant's ex-wife, and the victim lived with him for a few months in the early fall of

14

1994. He said he never saw the defendant mistreat the victim, and they had a good relationship. He said the defendant would scold the victim and smack his hand. On cross-examination, he said he did not observe the defendant when he lived with Ms. Boyer, and the victim was barely walking when he lived with him.

The defendant's mother, Mary Ruth Bolton, testified that after the defendant divorced his first wife, the victim's mother, the defendant and the victim lived with her and her husband. She said the defendant and victim had a loving relationship, and she never saw the defendant mistreat the victim. She said the defendant paid her one hundred dollars per week to buy the victim's food and supplies. She said the defendant also made a car payment to her. She denied telling Ms. Boyer to keep an eye on the victim when the defendant was around.

Mrs. Bolton testified that the defendant called her from the hospital on the night of the incident. She said she and her husband arrived at the hospital about ten minutes later, and the defendant was crying. She said the defendant could not tell her what was wrong, and he only said that the victim fell out of his highchair. She said her daughter drove them to UT Hospital, and the defendant cried the entire way. She said the defendant said, "He couldn't have hit his head that hard, he couldn't have." She said that when they arrived at UT Hospital, the defendant sat and cried. She said he tried to see the victim, but he was not allowed. She said the defendant has lived with her and her husband since the incident.

Mrs. Bolton said that on the night of the incident, she talked with Ms. Boyer on the telephone. She said Ms. Boyer told her that the victim was sitting in his highchair, and the defendant was at the hospital getting his finger treated. She said she could hear the victim talking.

15

On cross-examination, Mrs. Bolton testified that she took care of the victim when the defendant worked or went out to eat. She admitted that she took care of the victim a lot more than the defendant did, but she denied that the victim went to live with the defendant because her other children said he should. She said the victim went to live with the defendant because the defendant wanted to make a home for the victim. She said that she would do anything for the defendant and that she would not be much of a mother if she did not. She said she bought a car for the defendant, but he paid her for it. She said she paid off the defendant's bad checks. She said if the defendant needed something, he would not hesitate to ask her for it. With regard to the defendant's application for A.F.D.C. benefits and food stamps, she said that she believed the defendant requested that she not be contacted because the defendant knew she would give him money and that he thought she had given him enough. She said the defendant was not working full time. She said that she did not want the defendant to go to jail. She said that the defendant had been living with Ms. Boyer about two or three weeks before the victim's death. She said that it was later than 5:00 p.m. when she talked to Ms. Boyer on November 22. On redirect examination, Mrs. Bolton said that she would not lie under oath for the defendant.

The defendant testified that he worked for his brother-in-law at T&T Vinyl Siding periodically for two years. He said he also worked at Goody's, Little Caesars Pizza and Taco Bell. He said he was fired from Goody's because of excessive absenteeism. He said that his brother-in-law did not fire him from T&T Vinyl Siding. He said that when he worked for his brother-in-law, his weekly paycheck varied from one hundred to two hundred dollars. He said he paid three hundred dollars per month in rent, and he occasionally bought food for his family. He said that Ms. Boyer had A.F.D.C. benefits and food stamps. He said he provided clothing for the victim, and his parents helped buy things for the victim. He said the victim spent a great deal of time at

his parents' house. He said his mother was very attached to the victim. He said he loved the victim with all his heart.

The defendant testified that on November 22, 1995, he worked on a job for his brother-in-law. He said he had been working steadily there for the preceding three or four weeks. He said he injured his hand that day at about 2:00 or 3:00 p.m., but he continued to work. He said that when he returned home from work, Ms. Boyer told him that earlier that day, the victim had a temperature of one hundred and one degrees, and she had given him medicine. The defendant said the victim looked like he did not feel well and was unresponsive. He said he tried to make a doctor's appointment for the victim, but the clinic was closed for Thanksgiving. He said he gave the victim a bath while Ms. Boyer fed Alisha. He said that when he finished, he told Ms. Boyer that he was going to Wal-Mart to get a car part, and Ms. Boyer asked him to pick up Karo syrup. He said he did not find the car part, and he came back home, but he forgot the syrup. He said Ms. Boyer raised her voice, and he went back out and got the syrup.

The defendant stated that when he returned home, Ms. Boyer prepared dinner. He said he told Ms. Boyer that he might go to the emergency room later that night because of his finger, and he said he called his sister because she had studied nursing. He said he put the victim in his highchair to get him to eat. He said the victim started choking on his pork chop, and Ms. Boyer told the victim he could not have any juice until he ate. He said he told Ms. Boyer to give the victim the juice. He said the victim drank the juice but would not eat. He said he took the victim out of the highchair and sat the victim beside him on the couch. He said the victim watched television and still would not eat. He said that at about 10:30 p.m., he told Ms. Boyer he was going to the emergency room, and he put the victim to bed. He said he took the victim by the

17

hand and led him to bed.  He said the victim crawled into bed and cuddled up to his pillow.  He said he turned out the light and told the victim he loved him.

The defendant testified that he went to the emergency room and while he was waiting, he received a telephone call from Ms. Boyer.  He said Ms. Boyer was crying and frantic, and she told him that the victim had fallen out of his highchair.  He said he immediately sped home.  He said it never occurred to him to get an ambulance.  He said that when he arrived home, the victim was lying face down in his bed and appeared pale, limp and helpless.  He said he rolled the victim over and tested for a pulse, and the victim's eyes were dilated.  He said he scooped up the victim, ran through the trailer, and told Ms. Boyer he would be back later or he would call her.

The defendant stated that when he arrived at the emergency room with the victim, two paramedics asked him what happened.  He said he told them that the victim had fallen out of his highchair.  He said one of the paramedics took the victim's pulse, and the defendant took the victim into the examining room.  He said he left the victim and went to move his car, and when he came back, the doors leading to the victim were locked.  He said he sneaked in behind an employee but was escorted out to the waiting room.  He said he asked the front desk staff what was happening, but they did not give him any information.  He said he called his parents from the pay telephone, and they came to the hospital.  He said he repeatedly tried to get information on the victim's condition but could not.  He said when an employee asked him to give consent to have the victim flown to UT Hospital on LifeStar, he was shocked because he did not know the victim's condition was that serious.  He said he and his family went to UT Hospital where he stayed until 2:00 or 3:00 p.m. Thanksgiving day.  He said he was told that the victim suffered a heavy blow to the head and had very little chance of surviving.

18

The defendant testified that he never told Ms. Boyer to wake up the victim and feed him. He said his methods of discipline included a slight swat on the victim's diaper or a smack on his hand. He said he did not throw the victim against a wall.

On cross-examination, the defendant testified that the day before his testimony at trial, he called to speak to a friend, Bridgette Vickory, and he told Vickory's friend Rita Jean Dabney that if Vickory loved him, she should do something because the situation was not looking good. He said that by "situation," he meant the trial. He testified that he is healthy and strong and that his jobs have entailed a lot of heavy lifting. He said he knew that Ms. Boyer had a difficult pregnancy with Alisha. He said that during the past year, Alisha had been in DHS custody, and he had called only two or three times to check on her welfare. He said that in the past several months, he had made no effort to check on her welfare.

The defendant testified that he did not purchase pain medication for his finger when he went to look for a car part because he had pain medication at home. He admitted to giving a statement to Detective Smith on November 23 in which he said he did not have any pain medication in the house. He admitted to giving a statement to Detective Barton in which he said that on the night of the incident, he fed the victim juice and gave him Tylenol as he was walking out the door to go to the hospital for his finger. He admitted that his testimony on the stand was different from the statement he gave to Detective Barton.

The defendant stated that after he received the call from Ms. Boyer at the hospital, he ran to his car which was parked where the ambulance was parked. He said he did not ask anyone at the hospital for help. He said that when he returned to the hospital with the victim, two paramedics were flirting with the desk worker, and he had to get their attention. He denied swatting the victim's bottom that night. The defendant

19

admitted that things were not going well around the house in the weeks preceding the victim's death. He said he slept on the couch, and Ms. Boyer slept with the children. A statement by the defendant to Detective Smith was read into evidence in which the defendant stated that he suspected Ms. Boyer of seeing someone else and that he had glued the delete button on their caller identification box so that Ms. Boyer could not delete her telephone calls. At trial, he denied gluing the delete button.

The defendant stated that he did not think about taking the victim with him to the emergency room the first time even though Ms. Boyer had told him that the victim had been sick for two weeks. He admitted that he might have failed to keep three doctor's appointments that Ms. Boyer had made for the victim. He said that he and Ms. Boyer had agreed that he would discipline the victim, and he said he never saw Ms. Boyer discipline the victim. He said he rarely saw the victim other than fifteen minutes before work and fifteen minutes after work.

With respect to the application for A.F.D.C. and food stamps, the defendant admitted that he listed his income as four hundred and eighty dollars per month. The defendant's tax records were admitted into evidence, and they reflected that the defendant earned four thousand seven hundred and eighty dollars during a four month period. The defendant admitted that he lied on the A.F.D.C. and food stamp application for the purpose of receiving money. He explained that he must have inadvertently checked the "do not contact" box, listing his mother and Ms. Boyer, due to his poor eyesight. He admitted that he had seven worthless check charges and that passing a worthless check is a form of lying. He said that the jury had no reason to believe his testimony at trial.

Detective Scott Smith testified that he took a statement from Ms. Boyer on November 23, 1995, at 4:55 p.m. He said he talked to her for thirty to thirty-five

20

minutes before taping the statement. He said that he may have intimidated Ms. Boyer, but he did not threaten her. He said he interviewed Ms. Boyer again at 11:21 p.m., and a portion of the statement was read into evidence. In the statement, Ms. Boyer said that she was holding Alisha and trying to help the victim into his highchair, but she was dropping both of them. She said she was trying to drop the victim into the highchair, and she did not mean to throw him into the highchair. She said she did not think the victim would hit his head.

On cross-examination, Detective Smith testified that when he interviewed Ms. Boyer, he did not have the autopsy results. He said he did not know that the victim was already dying of a head injury when Ms. Boyer tried to get the victim in his highchair. He said Ms. Boyer looked like she felt guilty about the victim falling out of his highchair. He said that his original theory of the case was that the victim was fatally injured from falling out of the highchair but that his theory changed when he received the autopsy results.

Arthur Jones, Jr., the boyfriend of Ms. Boyer's mother, testified that since the incident, Ms. Boyer had seen Alisha three days per week and as often as she was allowed. He said Ms. Boyer called to check on Alisha nearly every night. He said that when Ms. Boyer is angry, she withdraws and does not become aggressive.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction. Specifically, he argues that Ms. Boyer was an accomplice, and her testimony was not corroborated. The state contends that Ms. Boyer was not an accomplice and that even if she was, her testimony was adequately corroborated.

21

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

In Tennessee, a conviction may not be based upon the uncorroborated testimony of an accomplice. <u>State v. Bigbee</u>, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is an individual who knowingly, voluntarily and with common intent participates with the principal offender in the commission of an offense. <u>State v. Lawson</u>, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "Mere presence at the scene of a crime does not make one an accomplice, nor does the mere fact that one was indicted for the same offense as the accused." <u>Letner v. State</u>, 512 S.W.2d 643, 647 (1974). When the facts are undisputed regarding a witness's participation in the crime, whether he is an accomplice is a question of law for the trial court. <u>State v. Perkinson</u>, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). However, when the facts are disputed or susceptible to different inferences, it is a question for the jury. <u>Conner v. State</u>, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). The jury determines whether an accomplice's testimony has been sufficiently corroborated. <u>Pennington v. State</u>, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (citation omitted). The general rule is that:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the

22

commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence be slight and entitled, when standing alone, to but little consideration.

Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971) (citations omitted).

In the present case, Ms. Boyer was indicted along with the defendant for first degree murder. The trial court submitted to the jury the issue of whether Ms. Boyer was an accomplice and instructed the jury on the need for corroborating evidence if it found Ms. Boyer to be an accomplice. With respect to the state's argument that the jury's acquittal necessitates a conclusion that it found her not to be an accomplice, our supreme court has concluded that a codefendant's acquittal does not affect his or her status as an accomplice witness. See Ripley v. State, 189 Tenn. 681, 688, 227 S.W.2d 26, 29 (1950). Thus, the jury could still find Ms. Boyer to be an accomplice despite her acquittal.

However, we believe that ample evidence exists from which a jury could conclude that Ms. Boyer was not an accomplice. The jury could have chosen to accredit Ms. Boyer's testimony, thus negating a finding that she knowingly, voluntarily and with common intent united with the defendant to commit the offense. In any event, we also believe that if the jury did find Ms. Boyer to be an accomplice, the evidence sufficiently corroborates her testimony. The medical examiner testified that the victim's injuries did not come from a highchair fall but rather from a strong impact to the victim's head with a blunt object. It is significant that when Ms. Boyer finally told Detective Smith about the defendant slamming the victim into the wall, it was before the autopsy results, which supported Ms. Boyer's statement, were available. Furthermore, the medical examiner's testimony regarding the timing of the victim's injuries is consistent with Ms. Boyer's testimony, as is the testimony of Sharon Sutton. The doctor who

23

treated the victim when he arrived at UT Hospital testified that the victim's injuries were consistent with a strong, young adult male throwing the victim into a wall. Sheriff McClellan testified that the defendant told him he aggravated his finger by swatting the victim on the bottom that night. Finally, the defendant testified that he was the sole disciplinarian of the victim and that he had never seen Ms. Boyer discipline the victim. We hold that this evidence sufficiently corroborates the testimony of Ms. Boyer.

## II. JUROR BIAS

The defendant contends that he was denied a fair trial when a juror failed to reveal a past relationship between the juror and a prosecutor during voir dire. The state responds that the defendant failed to prove that the juror was impartial or biased against him. We conclude that the juror had an obligation to reveal his relationship with the prosecuting attorney, and the failure to do so results in a presumption of bias. However, we believe that the presumption of bias was sufficiently rebutted.

The juror at issue is Barry Myers. During voir dire, the trial court asked the prospective jurors, "Do any of you at this time have or have you at any time in the past had any relationship with any of these parties or attorneys which might in any way affect your impartiality as jurors?" One prospective juror told the court that he was the neighbor of one of the defense attorneys and that he did not feel he could ignore the relationship and decide the case on the evidence. The prospective juror was dismissed by the trial court. Another member of the venire volunteered that he was friends with Sheriff McClellan, a state's witness, and that he thought it was possible that the relationship might interfere with his impartiality. The prospective juror was also excused by the trial court. Another prospective juror stated that he was a former client of one of the defense attorneys but that he believed he could fairly decide the case, and he remained on the panel.

24

The transcript of the voir dire reflects that the state and the defense attorneys conducted individual questioning of each potential juror. Of the seven venire members who were questioned before Mr. Myers, the state specifically asked five of them if they knew Assistant District Attorney General Shayne Sexton or any other member of the district attorney's office. Mr. Myers was not asked by either the state or the defense if he knew any members of the district attorney's office, but the state did ask him if he knew of anything the trial court should know that had not been asked, and he replied that he did not. Of the remaining venire members, some were asked specifically if they knew members of the district attorney's office and some were not.

At the hearing on the defendant's motion for a new trial, Mr. Myers testified that he went to high school with Assistant District Attorney General Shayne Sexton. He said that he and another person were roommates with General Sexton for nine months during the 1982-83 school year at The University of Tennessee. He said that after college, he saw General Sexton possibly once a year or every two years. He said he considered General Sexton to be a friend, but he did not have regular contact with him. He said he remembered being asked if any venire members had a past relationship with the attorneys that would affect their impartiality, and he admitted that he made no response. He said he remembered that one venire member stated that he was the neighbor of an attorney, and that person was excused.

On cross-examination, Mr. Myers testified that the questions were asked in the context of whether the relationship would affect the jurors' impartiality. He said he did not intend to conceal the relationship, rather he did not feel that it would affect his decision. He testified that he served as a juror on a case two weeks before the present case in which General Sexton was the lead prosecutor. He said the trial resulted in a hung jury, and he voted to acquit the defendant. He said he based his decision in the present case on the law and evidence presented, and he said he voted

to find Ms. Boyer not guilty. He said he was never asked if he knew General Sexton, and although he considered General Sexton to be a friend, he did not have much contact with him.

Assistant District Attorney General Shayne Sexton testified that he had passing contact with Mr. Myers since college, and he considered him to be a friend. He said he did not remember telling District Attorney General Phillips or Assistant District Attorney General Ripley about his relationship with Mr. Myers, although he said he might have told them that Mr. Myers would make a good juror. He acknowledged that he did not disclose the relationship to the defense attorneys or to the trial court. He said he did not think that his association with any juror would affect that juror's fairness.

Challenges to juror qualifications generally fall into two categories -- propter defectum or propter affectum. Partin v. Henderson, 686 S.W.2d 587, 589 (Tenn. Ct. App. 1984). General disqualifications such as alienage, family relationship or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). An objection based upon bias, prejudice or partiality is classified as propter affectum and may be made after the jury verdict is returned. State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990). The burden of proof with respect to juror bias or partiality rests with the party alleging the bias. Durham v. State, 182 Tenn. 577, 584, 188 S.W.2d 555, 559 (Tenn. 1945).

In Akins, this court addressed the issue of a juror's failure to disclose information reflecting potential bias or partiality and stated as follows:

> We hold that when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias, a presumption of bias arises. While that presumption may be rebutted by an absence of actual prejudice, the court must

26

> view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome.

867 S.W.2d at 357. The court also stated that the "integrity of the voir dire process depends upon the venire's free and full response to questions posed by counsel. When jurors fail to disclose relevant . . . information, counsel are hampered in the jury selection process," and the defendant's right to a fair trial and an impartial jury are affected. Id. In this vein, we believe that Mr. Myers had an obligation to reveal his relationship with General Sexton. Although Mr. Myers was never specifically asked if he knew General Sexton, the questions posed by the trial court to the venire as a whole and to other prospective jurors individually would lead a reasonable person to conclude that the relationship was relevant.

Because Mr. Myers failed to reveal the relationship, Akins instructs that a presumption of bias arises. However, we do not believe that the failure to disclose the relationship warrants reversal in this case because the presumption of bias has been sufficiently rebutted. The trial court concluded that the relationship between Mr. Myers and General Sexton had been casual at best since college and that there was no showing that the relationship affected the outcome of the proceedings. This court is required to accredit the findings of fact made by the trial court, and we cannot reverse the holding unless the evidence preponderates against the trial court's conclusions. See State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). In light of the nature of the relationship shown by the evidence and Mr. Myers' testimony, we conclude that it does not.

### III. IMPEACHMENT BY PRIOR BAD ACTS

The defendant contends that he was denied a fair trial when Ms. Boyer's attorney questioned him on cross-examination regarding his previous conviction and charges for passing worthless checks. He claims that the evidence is highly prejudicial

and that his conviction should be reversed. The state responds that questions regarding the defendant's conviction for passing worthless checks were appropriate under Rule 609, Tenn. R. Evid. and that the defendant opened the door on direct examination to questions about the charges that did not result in convictions. We hold that the questions were proper.

The record reflects that on direct examination, the defendant testified that he was charged with passing worthless checks in 1994. He testified that he pled guilty to some of the charges, that the others were paid and that he received probation. On cross-examination, Ms. Boyer's attorney questioned the defendant more specifically on the charges. He elicited from the defendant that he had five charges in Campbell County that were paid, one 1994 conviction in Anderson County, and one 1995 charge in Knox County. The defendant further admitted that passing a worthless check is a form of lying.

Pursuant to the conditions and procedures set forth in Rule 609, Tenn. R. Evid., the credibility of the accused may be attacked by presenting evidence of prior convictions. The convictions must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or false statement. Tenn. R. Evid. 609(a)(2). With respect to the cross-examination regarding the defendant's conviction, the questioning was proper under Rule 609. See State v. Bivens, 967 S.W.2d 821, 825 (Tenn. Crim. App. 1996) (concluding that passing a worthless check is dishonest conduct and is an appropriate subject for cross-examination). With respect to the defendant's complaint about the cross-examination regarding his worthless check charges, we believe that the defendant opened the door to this questioning by testifying generally about the charges on direct examination. Ms. Boyer's attorney was allowed to clarify the exact nature of the charges and their resolution. Having raised the issue on

direct examination, the defendant cannot now complain that the evidence was too prejudicial.  This issue is without merit.

## IV.  INTRODUCTION OF DIAGRAM AND REFERENCE TO COLOR PHOTOGRAPH

The defendant contends that the trial court erred by allowing into evidence a diagram of the victim's body and by allowing the medical examiner to refer to color photographs that were not admitted.  He contends that the diagram and the medical examiner's references to the color photographs were unduly prejudicial.  The state contends that the issues are waived because the defendant failed to object at trial and failed to raise the issues in his motion for a new trial.

The transcript of evidence reveals that before trial, the defendant made a motion to exclude autopsy photographs of the victim.  The state sought to introduce two color photographs and one black and white autopsy photograph depicting the victim's injuries.  In his argument, the defendant's attorney stated that the photographs were unnecessary because the medical examiner was going to use a diagram to explain the extent of the victim's injuries.  The trial court concluded that one photograph was admissible and allowed the defense attorneys to select the least objectionable photograph.  The attorneys chose the black and white photograph.

During the medical examiner's testimony, he used a diagram consisting of an outline of a child's body.  The medical examiner had drawn the location of the victim's bruises on the diagram and had used purple and yellow pencils to depict the age of the bruises.  Twice during his testimony, the medical examiner referred to the inadmissible color photographs.  Once, he explained that he had colored the bruises on the diagram as closely as possible to the color depicted in the photographs.  He also stated, in explaining an injury on the victim's right shoulder, that the injury could be

29

seen better in the color photographs. No objection was made to the admissibility of the diagram or to the references to the color photographs.

The defendant has waived these issues by failing to object timely. See T.R.A.P. 36(a). Furthermore, the defendant's failure to include these issues in the motion for a new trial bars our review. See T.R.A.P. 3(e). In any event, we note that in his pretrial motion to exclude the photographs, the defendant's attorney acknowledged that the probative value of the diagram was not outweighed by any prejudice. See Tenn. R. Evid. 403. Furthermore, although the defendant characterizes the medical examiner's references to the color photographs as repeated, there were just two innocuous references that can only be described as harmless.

## V. BIBLICAL REFERENCES

The defendant contends that the state's biblical references during closing argument were improper and violated his right to a fair trial as guaranteed by both the United States and Tennessee Constitutions such that a new trial is warranted. The state contends that the defendant's failure to object to the argument or to raise the issue in his motion for a new trial waives the issue. The state further argues that the defendant has failed to establish that the prosecutor's comments had an effect on the verdict.

The relevant portion of the state's closing argument is as follows:

There was a man long ago, a teacher. He was walking along a dusty road and others were following him. His closer followers called him rabbi. Teacher. And beside his close followers, there was a big crowd that followed him nearly everywhere he went. And as the man, the leader, the teacher, went along, he heard his close followers arguing amongst themselves. And he turned around and he said - why are y'all arguing? And they were sheepish. Because they didn't want to tell the rabbi why they were arguing. But he pressed them. He said - tell me, why are you arguing. And they said- well, rabbi, we just were wondering in the kingdom that you are going to set up, which one of us will be the greatest- who will

30

be number one, and who will be number two, who will be on your right hand and who will be on your left hand? And the teacher, he kind of took a test, he said- whoever - whoever would be great, he must be last and the least, and whoever- whoever would be great among you, must be the servant of all. And then he turned around and in the crowd that was gathered around him which is always - almost always there, he found a little child, a boy. He took the little boy and he sat the little boy in the midst of his close followers and he said - whoever receives a little one like this, receives me. Whoever receives a little one like this receives me. But you know, he didn't leave it there. He didn't leave it there. He went on to say sternly - but anyone, anyone who causes one of these little ones to stumble, it would be better for him if a millstone was put around his neck and he was drowned in the sea. The good rabbi said that.

Members of the jury, we simply ask for justice. Let justice come down like the mighty waters.

The record reflects that there was no objection made by the defendant's attorney.

The state initially contends that the defendant waived the issue by failing to object during trial and by failing to raise it in his motion for a new trial. See T.R.A.P. 36(a); 3(e). However, an error that affects a substantial right of a defendant may be raised at any time when necessary to do substantial justice. See Tenn. R. Crim. P. 52(b); T.R.A.P. 13(b); State v. Adkisson, 899 S.W.2d 626, 636-38 (Tenn. Crim. App. 1994). Accordingly, our review will be limited to whether plain error exists.

Our supreme court has recognized that closing argument is a valuable privilege for both the state and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). However, the argument must be temperate, predicated on evidence introduced at trial and relevant to the issues of the case. State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). When a prosecutor's argument goes beyond the latitude afforded, the test for determining if reversal is

31

required is whether the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (1965).

In the present case, the impropriety of the prosecutor's argument is obvious. See Cribbs, 967 S.W.2d at 783-84 ("It is well-established in Tennessee law that references to biblical passages or religious law during the course of a criminal trial are inappropriate"); Kirkendoll v. State, 198 Tenn. 497, 281 S.W.2d 243, 254 (Tenn. 1955). The prosecutor's omission of specific references to the Bible or to Jesus in no way disguises the biblical heritage of the story. We also believe that the argument had the potential to be inflammatory.

This type of argument has been admonished by both this court and our supreme court, yet the arguments continue to be made. However, the facts of this case constrain us to conclude that the argument did not affect the verdict to the prejudice of the defendant. The circumstantial evidence of the defendant's guilt was strong. The testimony from Ms. Boyer, Sharon Sutton, the medical examiner, the victim's treating doctors, and the paramedics support the verdict, as does the defendant's own testimony. Although the argument was improper, and we admonish the prosecutor to refrain from making such arguments in the future, we conclude that the argument did not affect the verdict. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) (holding that the prosecutor's repeated references to the defendant as "the evil one," though improper, did not affect the verdict to the prejudice of the defendant).

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
David H. Welles, Judge