IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 11, 2006 Session

## RAYMON HAYMON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Dyer County**
**No. C99-175A     Lee Moore, Judge**

_____

**No. W2005-01303-CCA-R3-PC  - Filed July 20, 2006**

_____

The petitioner, Raymon Haymon, appeals from the denial of his petition for post-conviction relief. On appeal, he raises thirteen issues regarding claims of ineffective assistance of counsel and the violation of certain constitutional rights. Following our review of the record and the parties' briefs, including the petitioner's reply brief, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Norma McGee Ogle and Alan E. Glenn, JJ., joined.

W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the petitioner, Raymon Haymon.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

The facts and procedural background of this case are set out in this court's decision on direct appeal as follows:

On July 19, 1997, the [petitioner] offered Wiled McMillin five hundred dollars to help him kill Jody McPherson. According to McMillin, the [petitioner] stated he wanted McPherson killed because "he didn't wanna go back to prison." The [petitioner] and McPherson had previously been arrested for the aggravated robbery of Pete's Liquor Store. McMillin refused the offer, and the [petitioner] stated he would get Terry Cork to help him. McMillin also testified that, later on that evening, he saw the [petitioner], Terry Cork, and Jody McPherson riding in a red car in the Middle City area.

Terry Cork testified that, on the evening of July 19th, he left work at 9:00 p.m. and went to his father's house. Around 10:00 or 10:30 p.m., Cork walked to Erline Warren's house to watch television. During the evening, the [petitioner] drove to Warren's house and, thereafter, he and Cork left in a red vehicle driven by the [petitioner]. The [petitioner] dropped Cork off at his aunt's house and subsequently returned with Jody McPherson in the car. The three men drove toward Middle City under the pretext of "hang[ing] out and talk[ing] to some women." Once en route, the [petitioner] stated that he needed Cork and McPherson to help him look for a discarded rifle in a field that would "take care of some business concerning the Pete's Liquor Store robbery." Upon arrival at a field in Middle City, the men lit newspaper torches and looked for the rifle. As they were searching, Cork observed the [petitioner] shoot McPherson several times. Cork claimed that he began to run, but the [petitioner] pulled a second gun on Cork and told him "that it was gonna be more than one person out there dead if [Cork] didn't listen to what [the petitioner] said." The [petitioner] then ordered Cork to also shoot McPherson. The [petitioner] instructed Cork to wipe the guns off and "throw the guns off the side of a little bridge that was out there, like a little creek."

McPherson's body was discovered the next morning with one visible wound to the chest and two other wounds to the head and back. A cell phone was found at the scene, which was linked to Cork. Cork and the [petitioner] were questioned by the police, and both men denied any involvement in the murder. When the [petitioner] was interviewed on July 20, 1997, he stated that he knew McPherson had been shot three times, "one from the head, one from the chest, and one from the back." At this point, no details of the murder had been disclosed to the public. After being taken into custody on a bank robbery charge in 1999, Cork confessed to his involvement in McPherson's death and helped the police recover one of the discarded weapons used in the murder.

On June 14, 1999, a Dyer County grand jury indicted the [petitioner] for the premeditated first degree murder of Jody McPherson. On March 9, 2001, after a trial by jury, the [petitioner] was convicted as charged and was sentenced to life imprisonment.

*State v. Raymon Haymon*, No. W2001-02797-CCA-R3-CD, 2003 WL 22080780, at *1-2 (Tenn. Crim. App., at Jackson, Sept. 5, 2003). This court upheld the petitioner's conviction on direct appeal. *Id.* at *8. Thereafter, the petitioner filed a petition for writ of error coram nobis, alleging that one of the witnesses at his trial had recanted his testimony. The trial court denied relief and this court affirmed. *Raymon Haymon v. State*, No. W2003-02535-CCA-R3-CO, 2004 WL 1359024, at *3-4 (Tenn. Crim. App., at Jackson, June 16, 2004). The petitioner then filed a timely petition for post-conviction relief and later an amended petition. The post-conviction court conducted an evidentiary hearing over the course of three days, during which the testimony of several witnesses

was presented. We limit our recitation of the testimony to that which is relevant to the petitioner's allegations in this appeal.

At the post-conviction hearing, the petitioner's trial counsel testified that he was unable to recall many of the specific details of petitioner's case. However, counsel recalled that he met with the petitioner "a lot" in the preparation of his case and his overall impression was that the petitioner was not guilty. Counsel stated that Terry Cork and Wiled McMillin's testimony was critical to the state's case-in-chief. Counsel also remembered that the petitioner made a couple of statements when he testified at trial "that didn't set well with the jury." Specifically, counsel recalled that the petitioner said, "I was innocent until I was proven guilty," during questioning regarding a prior offense.

Counsel testified that he could not recall the exact amount of time he had to prepare for trial, but he believed that he had an adequate amount of time to prepare. He said that another attorney, a legal assistant, and himself were primarily involved in the petitioner's case. Counsel stated he believed he discussed with petitioner the possibility of testifying at trial because it was a big question during the trial. Counsel stated he could not recall whether he requested a jury-out hearing to confirm the petitioner's desire to testify, but he remembered that at some point during the trial the petitioner "came up with a strong insistent desire to testify." Counsel said he and his staff prepared the petitioner to testify, but they did not conduct a mock cross-examination. Counsel elaborated that he could not have "dreamed up" the questions the prosecutor asked the petitioner which elicited the response "I'm innocent until proven guilty."

Counsel testified that he and his staff went through statements made by Cork and came up with fifty-one inconsistencies. Counsel stated that he felt that he was able to point out Cork's inconsistencies during trial. Counsel explained that he made a visual aid to show Cork's inconsistent statements and thought the aid was used during closing argument. He said that he believed the way he attacked Cork's statements helped the petitioner.

In further discussing Cork, counsel specifically remembered that Cork made a statement to Joel Cook where Cork said, "you're looking at the person . . . that shot that n_gger," referring to the victim. When questioned about counsel's interview with McMillin, counsel responded that although he could not remember whether the petitioner was present during the interview, he was comfortable with the interview. Counsel testified that he could not recall whether there was a tactical reason for not cross-examining McMillin about his testimony regarding the petitioner's request for help in killing the victim. Counsel further testified he could not recall whether he knew that McMillin suffered from schizophrenia, but acknowledged McMillin changed his story at trial.

On cross-examination, counsel reiterated that he and his staff met with the petitioner numerous times in preparation of the case. Counsel recalled that he investigated Cork's inconsistent statements and believed he introduced all five of Cork's pretrial statements into evidence at trial. Counsel stated that Cork's statements totaled ninety-four pages, making it difficult to select a specific contradiction to impeach Cork during his testimony.

Regarding McMillin, counsel admitted that he was aware of McMillin's prior statement implicating the petitioner. However, counsel said he believed McMillin was truthful when he said his prior statement to police was untruthful and that the petitioner was actually innocent. Counsel "vaguely remember[ed]" attempting to impeach McMillin when he reverted to his original story on the witness stand. Counsel recalled that the petitioner presented an alibi defense that he was at the Short Stop Market during the time in question. Counsel also remembered calling the petitioner's brothers, mother, and wife to help establish his alibi.

The petitioner testified that counsel represented him for the twenty months between indictment and trial. The petitioner recalled that while he spent a lot of time at counsel's office, he spent more time with co-counsel. The petitioner remembered he took McMillin to counsel's office to make a statement during which McMillin informed counsel that he suffered from schizophrenia. The petitioner stated that he went over all of Cork's statements with counsel and co-counsel and pointed out various inconsistencies. He recalled that counsel's legal assistant prepared a list of inconsistencies and was told it would be used as a demonstration to the jury. The petitioner said that during the cross-examination of Cork, he "didn't feel like it was going well" because counsel "wasn't catching him in those lies like it was on the paper." The petitioner thought that Cork's five statements would only be used for impeachment purposes rather than as substantive evidence.

Regarding his decision to testify, the petitioner stated that counsel told him "the case was gonna . . . boil down to [his] word against Terry Cork's word . . . and that if [he] got up there that he could show the jury that . . . he was living a different life." The petitioner admitted that counsel warned him that the state could bring up his past criminal record if he chose to testify. The petitioner testified that he knew the state was going to argue that the petitioner's motive for killing the victim was to prevent the victim from testifying against him regarding a liquor store burglary. The petitioner pointed out, however, that he took a plea on that charge in spring of 1998 and received two years of probation.

On cross-examination, the petitioner testified that he took notes during Cork's testimony and pointed out some of the inconsistencies to his counsel while Cork was testifying. According to the petitioner, counsel never questioned Cork about those inconsistencies.

Co-counsel testified that she talked to witnesses, met with the petitioner, and looked through the prosecutor's file on at least two occasions. She admitted that the petitioner's trial was her first murder trial. Co-counsel remembered that the defense theory at trial was that someone else had committed the murder. She recalled that they had the tape of a conversation between Joel Cook and Cork in which Cork admitted to committing the murder. However, the petitioner would not pay to have Cook brought in from federal custody in New York for trial, so the parties stipulated as to what Cook would have testified by entering a statement into evidence.

Co-counsel stated that she remembered they had a blown-up list of the inconsistencies in Cork's statements, but she did not know why counsel did not use the aid at trial. Co-counsel recalled

that counsel did question Cork about the "different lies he had told" and she believed counsel kept up with the inconsistencies as he questioned Cork. Co-counsel recollected that Reginald King gave a statement to officers, but Cork entered the room during King's statement and tried to convince King that the gun King sold him was a different type than King had remembered. Co-counsel denied telling the petitioner that he should make a claim of ineffective assistance of counsel.

On cross-examination, co-counsel testified that she and counsel discussed with the petitioner the pros and cons of testifying at trial and explained the types of questions he was likely to receive. Co-counsel remembered that she and counsel consulted with the petitioner as the trial progressed about questions to ask the witnesses or any other evidence that needed to be brought out. Co-counsel also recalled that she spent a tremendous amount of time attempting to get Cook transported from New York to testify about his conversation with Cork.

Tennessee Bureau of Investigation Agent Brent Booth testified that there was a cigarette butt found near the victim's body and the DNA on it did not match Cork, the victim, or several other individuals. However, Booth did not recall whether the petitioner's DNA was ever compared to the DNA on the cigarette butt. On cross-examination, Booth pointed out that testing the petitioner's DNA would not have necessarily excluded him as a suspect. Booth also testified that counsel requested his assistance in attempting to locate Cook.

Dyer County criminal investigators Terry McCreight and Calvin Johnson testified that they conducted a pretrial interview with King and Cork. Neither investigator could recall whether anyone from counsel's office contacted them regarding the circumstances of that interview.

Appellate counsel testified that he and another attorney were hired to take over the petitioner's case during the motion for new trial and appeal. They handled the motion for new trial, but the petitioner discharged them during the preparation for the appeal. Appellate counsel recalled that he identified numerous issues to raise in the motion for new trial and on appeal.

Wiled McMillin testified that he was diagnosed with schizophrenia prior to 1999 and was taking medication for it. McMillin recalled that he was interviewed by counsel and was never questioned about whether he was schizophrenic. On cross-examination, McMillin admitted that he did not remember ever telling his public defender or the prosecutor that he suffered from schizophrenia. However, McMillin maintained that he informed the petitioner, but he could not recall whether the petitioner advised counsel of his illness.

The petitioner testified in rebuttal that he informed counsel prior to trial that McMillin suffered from schizophrenia. According to the petitioner, counsel told him if McMillin's illness could be treated with medication it would not be useful in impeaching McMillin's testimony. On cross-examination, the petitioner testified that counsel and counsel's legal assistant were in the room when McMillin said that he was schizophrenic.

Counsel's legal assistant testified in rebuttal for the state that she was present throughout McMillin's entire statement and did not hear any mention of McMillin's illness. On cross-examination, the legal assistant admitted that she was not present during a subsequent meeting between counsel and McMillin that took place at the jail.

The parties stipulated that Janie Jeffries was one of the African-American members of the jury and that she could not read.

In denying the petitioner's request for post-conviction relief, the post-conviction court found as follows:

> From the testimony in the post-conviction trial, it is obvious that lead counsel and second chair along with their assistants spent many hours in trial preparation.

> In the trial transcript, [counsel] states during opening statement, "You will see in the proof a little later that during the course of giving not one, but five different statements to law officers, Mr. Cork told fifty-one lies." The trial transcript also reveals that [counsel] conducted a very rigid cross-examination of witness, Terry Cork. All of the prior Cork statements were introduced into evidence. [Counsel] was not allowed by the Court to use the blow-ups because they were paraphrases and not actual excerpts from the statements. [Counsel] went over each of the prior pre-trial statements given by Terry Cork and the inconsistencies of these statements from his trial testimony. He questioned Mr. Cork about various inconsistencies including, but not limited to denying ever being at the scene of the shooting; admitting being present at the time of the shooting; denying knowing where the guns involved were located; telling officers where the guns were located; pointing out that there were no admissions by Terry Cork until after he was arrested on a bank robbery charge; [counsel] adequately pointed out that he received a sentence for second degree murder involving Jody McPherson that ran concurrently with his bank robbery charge [and] stated as follows: "So, you get two for the price of one, don't you?" Mr. Cork then stated, "Yes, sir." He cross-examined Mr. Cork about not seeing Wiled McMill[i]n on the night of the murder. He also questioned him about the latex gloves that were found at the scene. At the end of his cross-examination of Terry Cork, [counsel] conferred with [the petitioner] and then questioned Cork about gang affiliations. Gang affiliations of Cork and McPherson were significant in attempting to point out a motive for Cork to have committed the murder.

> It is also significant to note from the trial transcript that [counsel] in his closing arguments argued burden of proof, reasonable doubt and the requirement of the jury to make a decision that would not be based on speculation. He argued the conflict between Cork's testimony of the murder and the timing of the murder along with a video from Shortstop Convenient Store supposedly giving [the petitioner] an alibi. He set up columns on the black board for [the petitioner], Cork and McMill[i]n, although the transcript does not show how those columns were used. He

argued discrepancies in Cork's testimony about the positioning of the McPherson body. He argued the different theories of possible guilt of Fred Cole, and inconsistencies of the McMill[i]n testimony and prior pre-trial statements. He referred to various statements of Terry Cork and [the] deal that Terry Cork received from the State for his testimony. He argued the accomplice rule and lack of corroboration. He argued other motives for the murder of Mr. McPherson including gang affiliation motives. He referred to his blow up of the fifty-one discrepancies and advised the jury that if they would take a look at the pre-trial statements of Cork they could see these contradictions. He asked the jury during their deliberations to review the statements instead of reviewing the boards showing the blow-ups. He summarized the testimony of [the petitioner's] family members.

The Court finds, therefore, that petitioner has failed to carry his burden of proof in showing that his attorney's performance was deficient or resulted in any prejudice so as to deprive him of a fair trial. The Court finds that the performance of [counsel] and [co-counsel] was well within the range of competence demanded of attorneys in criminal cases. The proof is clear and convincing that trial counsel spent many hours in pre-trial preparation. The Court also finds that the opening statement and closing arguments were effective and well within the wide range of acceptable professional assistance. Trial counsel effectively engaged witnesses, Terry Cork and Wiled McMill[i]n, in rigid cross-examination pointing out the various contradictions in their pre-trial statements and their trial testimony. Any failure on the part of trial counsel to cover credibility issues on closing argument would be in the form of trial strategy rather than ineffective assistance of counsel.

The statement of Terry Cork taken by informant, Joel Cook, wherein Mr. Cork states that Cork killed McPherson was introduced and available to the jury during their formal deliberations.

It also appears to the Court that trial counsel made an effective attempt or effort to undermine the State's motive for the murder of Jody McPherson. Petitioner simply fails to carry his burden of proof in showing ineffective assistance of counsel by his trial counsel. There also is no showing of any prejudice even if ineffective assistance had been shown.

[Counsel] does not recall ever having been advised that Wiled McMill[i]n suffered from schizophrenia. [The petitioner] states that he advised [counsel] that Wiled McMill[i]n suffered from schizophrenia. [Counsel's legal assistant] denies that they were ever advised that McMill[i]n suffered from schizophrenia. Even if McMill[i]n was suffering from schizophrenia there is no showing by the petitioner that there was any prejudice to his case based on this finding. There is no showing that the pre-trial statement of Wiled McMill[i]n was coerced by law enforcement

officers. McMill[i]n was carefully cross-examined by trial counsel. The Court finds no deficiency in trial counsel's efforts to attack the credibility of McMill[i]n.

The Court finds that adequate discussion and advice regarding [the petitioner's] right to testify or to refuse to testify was given both prior to trial and during trial. [The petitioner] made the decision to testify knowing his fifth amendment rights. He simply failed to hold up well on cross-examination.

[Appellate counsel] prepared and filed a Motion for New Trial and an Amended Motion for New Trial after [trial counsel] had been discharged by [the petitioner]. The Court finds that the efforts of [appellate counsel] were well within the range of competence demanded of attorneys in criminal cases. Petitioner fails to show any deficient performance on the part of [appellate counsel] or any prejudice. Petitioner may have been prejudiced on appeal because appeal was pursued on a pro se basis. The Court, however, feels the petitioner was the author of his own injury, if any, on appeal as the proof was quite clear that he voluntarily terminated and discharged [appellate counsel] prior to the time that the appellate brief was filed. The Court of Criminal Appeals allowed [appellate counsel] to withdraw from the case because of the terminations.

The Court is concerned that the charge read by the Court as shown on Page 1014 of the trial transcript at Line 3, reads that the petitioner "should be found guilty." After reading the charge in its entirety, however, it is clear that this was an error and the jury was adequately charged about finding the [petitioner] either guilty or not guilty based on the evidence and the law as charged by the Court. Based on the foregoing, the Court denies the petition . . . for post-conviction relief.

## STANDARD OF REVIEW

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is de novo with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Id.*

To establish ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional

standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id.* (citations omitted).

## ANALYSIS

On appeal, the petitioner presents thirteen issues for our review, including a number of one-paragraph blanket contentions. We will address the petitioner's issues as follows:

I.      Trial counsel was ineffective for telling the jury during his opening statement that Cork, the co-defendant and key state witness, told "fifty-one lies" but failed to demonstrate fifty-one inconsistencies to the jury.

II.     Trial counsel was ineffective for failing to thoroughly cross-examine Cork regarding the numerous inconsistencies found in his five pretrial statements and trial testimony.

III.    Trial counsel was ineffective for failing to discover that a member of the jury could not read before urging the jury to "see the contradictions for themselves."

IV.     Trial counsel was ineffective for failing to discover that McMillin, a key state witness, suffered from schizophrenia.

V.      Trial counsel was ineffective for failing to request that Cork's pretrial statements only be admitted for impeachment purposes.

VI.     Trial counsel was ineffective for failing to have Cook's statement regarding Cork's incriminating admission read aloud.

VII.    Trial counsel was ineffective for failing to pursue an alternate theory that Cork committed the crime alone.

VIII.    Trial counsel was ineffective and his constitutional right against self-incrimination was violated when counsel failed to adequately prepare him to testify at trial and did not request a jury-out *Momon* hearing prior to him testifying.

IX.    Trial counsel was ineffective for failing to object to the trial court's misstatement in the jury instruction.

X.    He received the ineffective assistance of appellate counsel.

XI.    He received the ineffective assistance of counsel based on the cumulative error.

XII.    His due process rights were violated because a juror who could not read was asked to consider significant documentary evidence during deliberation.

XIII.    His due process rights were violated by the trial court's misstatement in the jury instruction.

**I.**

The defendant first argues that trial counsel was ineffective for telling the jury during his opening statement that he would demonstrate Cork told "fifty-one lies" but "failed utterly to accomplish that." In support of his argument, the petitioner relies on *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991), where a panel of this court determined that trial counsel was ineffective based on cumulative error, which included counsel's making a promise to the jury during opening statement then changing strategy in the middle of the trial without a sound reason. *Id.* at 226-28.

Initially, we note that *Zimmerman* is distinguishable from the case at hand. In *Zimmerman*, counsel promised the jury they would hear proof about a battered-wife syndrome defense; yet *no* proof was presented. Whereas, in this case, counsel did not abandon a defense mid-trial, but instead, counsel did not perfectly achieve the development of his defense strategy.

Our review of the record reveals that counsel's cross-examination of Cork consumes over seventy pages of trial transcript. The record further shows that counsel moved Cork's statements into evidence and went through portions of each statement and questioned Cork about a number of inconsistencies between the statements. While we caution that making promises during opening statements is a dangerous practice, it is our view that counsel's failure to point out exactly fifty-one inconsistencies does not mean his representation fell below the objective standard of reasonableness demanded of an attorney in a criminal case. The idea behind counsel's opening statement was to attack Cork's credibility, and counsel diligently worked to fulfill that endeavor. A defendant is not entitled to perfect representation, only constitutionally adequate representation. *See Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Accordingly, the petitioner has failed to show by clear and convincing evidence that counsel's performance was deficient in this regard.

**II.**

The petitioner argues that trial counsel was ineffective in failing to thoroughly cross-examine Cork and not utilizing visual aids during Cork's cross-examination. The specific areas the petitioner argues deficiency are: (1) Cork's statements concerning how he came into possession of a gun on July 20, 1997; (2) Cork's statements about the details of the shooting; (3) the number of times Cork claimed he pulled the trigger; (4) Cork's statements about a rifle found in Middle City; and (5) Cork's statements about leaving the scene of the shooting and going to Dyersburg. The crux of the petitioner's argument is that counsel was deficient in his cross-examination of Cork because counsel was not prepared.

First, the record reflects that counsel was prepared to conduct his cross-examination of Cork. Testimony from the post-conviction hearing indicated that counsel spent a tremendous amount of time over a twenty-month time period preparing for trial. Counsel and his staff poured over Cork's five statements and discussed the inconsistencies in the statements with the petitioner.

Second, counsel's cross-examination of Cork was vigorous. While counsel may have failed to touch upon the five specific inconsistencies listed by the petitioner, counsel did capitalize on numerous inconsistencies in an effort to undermine Cork's credibility. The fact that counsel failed to impeach Cork on every inconsistency does not demonstrate deficient performance of counsel.

Additionally, counsel's failure to utilize visual aids does not demonstrate deficient performance and in fact the petitioner offers no authority for this theory. In our view, the inconsistencies in Cork's five statements were brought out during cross-examination and were reviewable after the statements were entered into evidence. Counsel should not be deemed to have been ineffective merely because he failed to employ additional modes of impeachment which may or may not have produced a different result. *See Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). Again, a defendant is only entitled to constitutionally adequate representation, not perfect or error-free representation. *See Denton*, 945 S.W.2d at 796. Thus, the petitioner has failed to show by clear and convincing evidence that counsel was deficient in his cross-examination of Cork.

**III.**

The petitioner argues that trial counsel was ineffective for failing to determine whether a juror could read before urging the jury to "see the contradictions [in Cork's statements] for themselves." First, the petitioner has failed to show exactly how counsel's performance was deficient for failing to uncover this fact. Defense counsel is not required to be omniscient. Therefore, we are hesitant to find that an attorney is deficient for failing to question potential jurors about their literacy during the voir dire process.

Second, we note that the Tennessee Supreme Court was asked to determine a similar issue in *Kirkendoll v. State*, 281 S.W.2d 243 (Tenn. 1955). In *Kirkendoll*, our supreme court examined

the issue of whether it was error to have a written jury charge when a member of the jury could not read. The court observed that "other jurors if necessary could read . . . to that juror who could not read while in the jury room." *Id.* at 255. The court concluded that there was no error as long as the written material was in the jury room and other members of the jury could read. *See id.* We find the reasoning in *Kirkendoll* applicable to this case.

Moreover, the petitioner has not provided any evidence demonstrating how he was prejudiced by a singe juror's inability to read. Here, many of Cork's inconsistent statements were brought to the jury's attention during cross-examination. Also, the petitioner provided no evidence that the juror's illiteracy influenced the deliberation process. *See State v. Cauthern*, 967 S.W.2d 726, 747-48 (Tenn. 1998) (Appendix) (applying the reasoning in *Kirkendoll* and stating that the defendant failed to point to anything in the record demonstrating that he suffered prejudice as a result of a juror's illiteracy). Accordingly, the petitioner is not entitled to relief on this issue.

## IV.

The petitioner argues that trial counsel was ineffective for failing to discover that McMillin, the state's key witness, suffered from schizophrenia. In making this argument, the petitioner apparently asserts that McMillin's testimony should have been impeached by addressing McMillin's schizophrenic behavior in making contradictory statements concerning the petitioner's guilt. In addressing this issue, we first note that although the petitioner avers that he informed counsel of McMillin's illness, neither counsel nor his legal assistant recalled being so informed. In fact, McMillin stated that he never told his attorney or the prosecutor about his schizophrenia, and he could not recall whether the petitioner told his counsel about the illness. Without some indication on McMillin's part that would have put counsel on notice that McMillin had a mental illness, we fail to see how counsel's cross-examination could be considered deficient. *See Jimmy Rogers v. State*, No. W1999-1453-CCA-R3-PC, 2000 WL 1230249, at *2 (Tenn. Crim. App., at Jackson, Aug. 22, 2000), *perm. app. denied* (Tenn. Mar. 12, 2001) (holding that it was not ineffective assistance for counsel to not request a mental evaluation when there was no indication that the defendant was incompetent or suffering from a mental illness). The petitioner has failed to show that counsel knew or should have known that McMillin was schizophrenic.

Furthermore, we do not see how the petitioner was prejudiced by any alleged deficiency. McMillin testified that he took medicine to control his mental illness which lessened any potential impeachment value, and counsel mounted an otherwise vigorous cross-examination of McMillin. Accordingly, the petitioner has failed to prove by clear and convincing evidence that counsel was ineffective for failing to discover that McMillin suffered from a mental illness or that such ineffectiveness caused him prejudice.

## V.

The petitioner argues that trial counsel was ineffective for failing to ask the court to admit Cork's pretrial statements only for impeachment purposes and not as substantive evidence. The

petitioner failed to provide any argument as to how such alleged deficiency caused him prejudice. Accordingly, the petitioner has failed to prove by clear and convincing evidence that counsel was ineffective in this regard.

## VI.

The petitioner argues that trial counsel was ineffective in his handling of informant Cook's conversation with Cork in which Cork admitted to shooting the victim. The petitioner contends that counsel should have read the entire statement detailing this conversation aloud so the jury could see "the full effect of the statement," instead of referencing portions of the statement, then allowing the jury to analyze the statement itself.

From our review, it appears that counsel thoroughly cross-examined Cork about his conversation with Cook. Moreover, the statement was entered into evidence as an exhibit, allowing the jury to fully explore the conversation. The petitioner argues that the failure to have the statement read aloud was "very critical" because one juror was unable to read. However, as noted earlier, other jurors could read and discuss the statement with that juror, and counsel's extensive cross-examination of Cork brought out much of the crucial substance of the conversation. Additionally, we reiterate that counsel should not be deemed ineffective for employing a different strategy or tactic than the petitioner now claims as preferable. Thus, the petitioner is not entitled to relief on this issue.

## VII.

The petitioner argues that trial counsel was ineffective for failing to fully pursue the theory that Cork committed the murder alone. We do not see how counsel's failure to pursue every possible theory amounts to constitutionally deficient performance. To reiterate, counsel's performance is evaluated without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Here, counsel made an informed tactical decision to discredit Cork's testimony regarding the petitioner's involvement in the murder. The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. Accordingly, the petitioner is not entitled to relief on this issue.

## VIII.

The petitioner argues that counsel was ineffective for failing to adequately prepare him to testify at trial. The petitioner also argues that his constitutional right against self-incrimination was violated because counsel did not request a *Momon* jury-out hearing prior to his testifying to determine whether his waiver was knowing and voluntary.

First, we fail to see any deficiency on the part of counsel in preparing the petitioner to testify at trial. At the post-conviction hearing, counsel testified that he prepared the petitioner to testify. Co-counsel also testified that she recalled discussing the pros and cons of testifying with the

petitioner as well as the types of questions he might be asked. The petitioner relies on the fact counsel did not prepare him via a mock cross-examination. However, a mock cross-examination is not the only method of preparing one's client to testify.

Second, no *Momon* error exists because the petitioner chose to testify. *Momon* requires a jury-out voir dire of a defendant to ensure that the defendant is voluntarily and knowingly *waiving* his right to testify. *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999). We do not read *Momon* to require a jury-out voir dire prior to the defendant's exercising his or her right to testify. Indeed, the language in *Momon* itself, "in every trial where the defendant *does not testify*, the trial court should allow, and indeed require, defense counsel to employ the following procedure," supports this reading. *Id.* at 162 (emphasis added). Moreover, the post-conviction court found that the petitioner received adequate advice regarding his right to testify and made the decision to testify knowing his Fifth Amendment rights. The evidence does not preponderate against that finding.

## IX.

The petitioner argues that trial counsel was ineffective for failing to object to a jury instruction that the petitioner "should be found guilty." The petitioner, however, has failed to provide any argument or authorities in support of this contention. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

## X.

The petitioner argues that he received the ineffective assistance of appellate counsel. However, the record reflects, and the post-conviction court found, that the petitioner voluntarily discharged his appellate counsel prior to his brief being due. As noted by the post-conviction court, the petitioner was the "author of his own injury." Accordingly, the petitioner has failed to prove by clear and convincing evidence that he received the ineffective assistance of appellate counsel.

## XI.

The petitioner argues that he received the ineffective assistance of counsel based on the cumulative error. In light of our previous determinations, this issue is without merit.

## XII. AND XIII.

Lastly, the petitioner argues that his due process rights were violated because a juror who could not read was asked to consider significant documentary evidence and because the trial court gave a jury instruction that he "should be found guilty." Initially, we note that the petitioner has waived these issues for failing to raise them in a motion for new trial or on direct appeal. *See* Tenn. Code Ann. § 40-30-106(g). Notwithstanding waiver, we conclude these issues have no merit.

First, the petitioner has failed to demonstrate by clear and convincing evidence that he was prejudiced by a single juror's inability to read. As noted previously, it is not error per se to have a member of the jury who cannot read. *Kirkendoll*, 281 S.W.2d at 524-25. The petitioner has not presented proof of how the juror's inability to read affected her deliberation and understanding of the evidence. Instead, the petitioner broadly asserts that "it was impossible for her to read and understand the mass of documentary evidence present." As such, the petitioner has not demonstrated any violation of his due process rights.

Regarding the jury instruction, the record indicates that the charge was not prejudicially erroneous although it contained a misstatement.[1] The trial court's charge read in part:

> The punishment for this offense is death, life imprisonment, or life imprisonment without the possibility of parole. The State, however, is not seeking the death penalty, and, therefore, *you should return a verdict of guilty*. After a separate hearing, you will impose a sentence of life imprisonment without the possibility of parole, or life in prison.

> On the other hand, *if you find the defendant not guilty* of first degree murder, or if you have a reasonable doubt thereof, then your *verdict must be not guilty* as to this offense, and then you will proceed to determine his guilt or innocence of the lesser included offense of second degree murder.

In reviewing a claimed error in the jury charge, this court reviews the charge in its entirety, read as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). This court can find error only if, when read as a whole, the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Read as a whole, it is our view that despite the misstatement, the charge clearly instructed the jury on its duty and did not inform the jury that it should find the petitioner guilty. Accordingly, the petitioner is not entitled to relief on either of these issues.

## CONCLUSION

Upon our review of the record and the parties' briefs, we conclude there is nothing in the record that preponderates against the trial court's finding that the petitioner received the effective assistance of counsel. Furthermore, our review revealed no violation of the petitioner's constitutional rights. Therefore, we affirm the post-conviction court's denial of post-conviction relief.

---

[1] We note that the petitioner failed to include a written copy of the jury charge in the record on appeal. Therefore, our analysis is based on the jury charge as reflected in the trial transcript.

-15-

_____
J.C. McLIN, JUDGE